STATE OF MINNESOTA

IN SUPREME COURT

A23-1400

Court of Appeals                                                    Gaïtas, J.
                                        Dissenting, Moore, III, McKeig, Hennesy, JJ.
State of Minnesota,

                    Respondent,

vs.                                                            Filed: July 15, 2026
                                                        Office of Appellate Courts
Tracey Dee Keyes,

                    Appellant.

_____


Keith Ellison, Attorney General, Saint Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Peter R. Marker, Assistant Ramsey County
Attorney, Saint Paul, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Benjamin J. Butler, Assistant
Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      Appellant did not forfeit the issue of whether a specific-unanimity

instruction was required.

2.      When the State charges one count of criminal conduct but presents

evidence of more than one distinct act, each of which on its own could prove the

elements of the charged offense, a defendant is entitled to a specific-unanimity

1

instruction, which advises the jury that it must unanimously agree as to the distinct act that proves the elements of the charged offense.

3.     To determine whether a specific-unanimity instruction is required, a court must first look to the statute defining the offense to identify the elements of the offense and then determine whether the State has alleged more than one distinct act that could prove those elements.

4.     The district court abused its discretion in denying appellant's request for a specific-unanimity instruction because the State alleged two distinct acts of nonconsensual sexual penetration, either of which on its own could have proved the single charged offense of first-degree criminal sexual conduct.

5.     The district court's error in denying appellant's request for a specific-unanimity instruction was not harmless beyond a reasonable doubt because it is reasonably likely that some jurors believed that appellant sexually penetrated the victim in the bedroom but not the living room, while other jurors believed that appellant sexually penetrated the victim in the living room but not the bedroom.

Reversed and remanded.

O P I N I O N

GAÏTAS, Justice.

In this case, which involves disturbing allegations of domestic violence and sexual assault, we consider whether a district court must give a specific-unanimity jury instruction when the State charges a single count of a crime but alleges distinct acts, each of which on its own could constitute the crime. Respondent State of Minnesota charged

2

appellant Tracey Dee Keyes with several criminal offenses, including first-degree criminal sexual conduct involving his former intimate partner, S.B. At trial, S.B. testified that Keyes committed two distinct acts of nonconsensual sexual penetration. Keyes asked the district court to instruct the jury that unanimous agreement was required as to which specific act of penetration satisfied the offense of first-degree criminal sexual conduct, but the district court denied the request. The jury found Keyes guilty of first-degree criminal sexual conduct, among other offenses. Keyes appealed to the court of appeals, arguing that the district court's denial of a specific-unanimity jury instruction violated his constitutional right to a unanimous jury verdict. The court of appeals rejected this argument and affirmed. We granted Keyes's petition for further review.

We conclude that when the State charges one count of criminal conduct but presents evidence of more than one distinct act, each of which on its own could prove the elements of the charged offense, a defendant is entitled to a specific-unanimity instruction, which advises the jury that it must unanimously agree as to the distinct act that proves the elements of the charged offense. To determine whether a specific-unanimity instruction is required, a court must first look to the statute defining the offense to identify the elements of the offense and then determine whether the State has alleged more than one distinct act, each of which on its own could prove those elements. Here, because the State alleged two distinct acts of nonconsensual sexual penetration, either of which could have proved a single charged offense of first-degree criminal sexual conduct, the district court abused its discretion in denying Keyes's request for a specific-unanimity instruction. Because it is reasonably likely that some jurors believed that

3

appellant sexually penetrated the victim in the bedroom but not the living room, while other jurors believed that appellant sexually penetrated the victim in the living room but not the bedroom, the district court's error was not harmless beyond a reasonable doubt. We therefore reverse and remand for a new trial on the first-degree criminal sexual conduct charges.

**FACTS**

The following summary of the facts is based on the evidence presented at Keyes's jury trial. S.B. and Keyes met on a dating website in 2021. In summer 2021, Keyes moved in with S.B., her children, and her two nieces and nephew. That winter, Keyes began to call S.B. derogatory names and accuse her of infidelity. Following an argument in January 2022, during which S.B. felt threatened and called police, S.B. told Keyes that he could no longer stay in her home. Keyes did not return his key to S.B. before leaving.

In the early morning hours of February 4, 2022, S.B. drove her daughter to work and noticed that Keyes was following her. When S.B. and her daughter arrived at her daughter's workplace, Keyes drove past them in his car, and he then left the parking lot.

S.B. returned home alone after dropping off her daughter. S.B.'s nieces and nephew—ages nine, six, and five—were home, and S.B. intended to get the children ready for school.

As S.B. arrived at her front door, Keyes approached her and asked if he could retrieve his belongings from inside. He seemed calm, so S.B. let him inside. Keyes went to S.B.'s bedroom. The children were still in bed in their bedroom.

4

After 15 to 30 minutes, S.B. grew concerned that Keyes was not gathering his belongings. She went to the bedroom to tell him to leave.

According to S.B., when she entered the room, which was dark, Keyes knocked her to the ground, sat on her back, and repeatedly punched her in the head. S.B. testified that while on the ground she was "seeing stars." Eventually, S.B. told Keyes to get off of her. Keyes responded, "You gonna suck my dick." He allowed S.B. to get up and sit on the edge of the bed. Then, according to S.B., Keyes pulled down his pants and put his penis in S.B.'s mouth. S.B. testified that during this encounter, Keyes punched her again because she "wasn't doing it right." She told Keyes, "You're going to kill me," to which Keyes replied, "That's what I came here to do."

At some point, S.B. and Keyes moved to the living room. S.B. testified that she asked Keyes to get her water, hoping this would provide her with an opportunity to leave the house. But Keyes pulled S.B. down onto the couch, wrapping his arm underneath her neck. S.B. struggled to remove Keyes's arm from her neck, and he let go. Then, according to S.B., "[W]e tried with the oral sex again because he … said that, '[y]ou gonna suck my dick like you do everybody else.' " S.B. testified that she was sitting on the edge of the couch when Keyes again put his penis in her mouth. She complied because she believed it was the only way to prevent Keyes from punching her. The children suddenly entered the living room, and both S.B. and Keyes "jumped up." At that point, S.B. began to get the children ready for school.

According to S.B., the entire incident—including the sexual act in the bedroom and the sexual act in the living room—was approximately 45 minutes to one hour long.

Keyes then allowed S.B. to prepare the children for school. S.B. drove two of the children to their bus stop, leaving one child—the nine-year-old—at home so that Keyes would not suspect that she planned to seek help.

Rather than returning home, however, S.B. reported the incident to police. Officers went to S.B.'s home and arrested Keyes. The third child left in the home was turned over to S.B.'s sister while the police investigation was ongoing.

S.B. was transported to the hospital by ambulance, where she received treatment for her injuries and underwent a sexual assault examination. A swab taken from S.B.'s mouth during the sexual assault examination contained Keyes's DNA.

Based on this incident, the State charged Keyes with first-degree criminal sexual conduct (Minn. Stat. § 609.342, subd. 1a (Supp. 2021)); third-degree assault (Minn. Stat. § 609.223, subd. 1 (2020)); threats of violence (Minn. Stat. § 609.713, subd. 3(a)(1) (2020)); and false imprisonment (Minn. Stat. § 609.255, subd. 2 (2020)).[1] Keyes pleaded not guilty, and the case went to trial in January 2023. When the jury was presented with a video that did not include redactions agreed upon by the parties, the district court declared a mistrial.[2]

---

[1]    The conduct in this case occurred in February 2022. At that time, the 2020 version of Minnesota Statutes was in effect. Here, when describing Keyes's alleged offenses, we cite to the statutes in effect in 2020.

[2]    The original complaint charged Keyes with first-degree criminal sexual conduct causing fear of imminent great bodily harm (Minn. Stat. § 609.342, subd. 1(a) (Supp. 2021)). Following the mistrial, the State amended the complaint, adding two additional counts of first-degree criminal sexual conduct: first-degree criminal sexual conduct causing personal injury while using force (Minn. Stat. § 609.342, subd. 1(c)(ii) (Supp. 2021)); and first-degree criminal sexual conduct causing personal injury while

6

A second trial was held the following month. Keyes's counsel conceded that Keyes had assaulted S.B., and the focus of the trial was whether Keyes committed first-degree criminal sexual conduct.

The State's trial theory was that the entire incident, including both instances of sexual penetration that S.B. described—the instance in the bedroom and the instance in the living room—satisfied the elements of first-degree criminal sexual conduct.

Keyes's defense was that S.B. had fabricated the sexual assault allegations. Defense counsel highlighted evidence that S.B. had consistently reported just one instance of sexual penetration, but for the first time during her testimony, had alleged a second instance. The defense also attacked S.B.'s general credibility. Keyes's attorney cross-examined S.B. about inconsistencies in her statements and impeached her testimony that she did not use drugs with evidence that her urine contained methamphetamine.

Near the end of the trial, the attorneys met with the district court to discuss whether the district court would give the jury an instruction regarding specific unanimity. A specific-unanimity instruction advises the jury that when the State charges one count of criminal conduct but presents evidence of more than one distinct act, each of which on its own could prove the elements of the charged offense, the jury must unanimously agree as

_____

using coercion (Minn. Stat. § 609.342, subd. 1(c)(i) (Supp. 2021)). For purposes of the arguments that the parties have made on appeal and our analysis of those arguments, the additional charges are immaterial, and therefore no further discussion of these charges is required.

7

to the distinct act that proves the elements of the charged offense. The discussion concerning the instruction began as follows:

> THE COURT: Did the parties want to talk about the -- just the unanimity issue now -- was -- did you want any more time to address that, [prosecutor]?
>
> PROSECUTOR: Well I just sent a case so if the Court wants to do it now, we can. I think I potentially could have more cases tomorrow, but the case that I sent kind of summarizes with other cases so whatever you prefer.
>
> THE COURT: Would you want to talk a little bit about it and then make a final -- reach a final resolution either later this evening or first thing early tomorrow morning?

The prosecutor then asserted that a specific-unanimity jury instruction is not warranted when multiple acts occur during the course of a single behavioral incident. According to the prosecutor, the sexual assaults that S.B. alleged constituted a single behavioral incident. Keyes's counsel responded that a specific-unanimity instruction was required, stating that "the jury needs to be instructed that if six of them believe that an act of penetration occurred in the bedroom and six of them believe that an act of penetration occurred in the living room, that that is not considered a unanimous verdict." After further discussion, the district court and Keyes's counsel had the following exchange:

> THE COURT: And I'm still kind of thinking about -- my initial thought was -- which is that this is kind of one -- it's alleged to be one big 45 minute assault that includes all of these things if -- if the jury's to be believed. So, unlike assaults, sexual assaults that would have occurred over a period of time, I don't -- I don't see 45 minutes being appropriate to break down. I mean, that's my initial thought and I'd want to hear from both sides a little further since we're just sort of talking about this issue for the first time today.
>
> [KEYES'S COUNSEL]: And -- and I understand what the Court's saying with that and the case law cited by [the prosecutor]. I think I would just note that the -- that if at any point, I guess, during closing or -- or rebuttal, if it seems to be that the -- the door's being opened for, you know, hey you can -

8

- you can believe that it happened here, you can believe -- you know. If it -- if -- if the State starts to -- to put -- bring this issue in based on its argument, like what happened in the case that I sent that I can't remember the name of, I might ask to, you know, readdress or ask for an instruction at that point.

The prosecutor responded that she didn't think she "would go in that direction."

Then, the following exchange occurred:

> THE COURT: I mean, if -- if we didn't have the unanimity and it's written just like -- like it was originally sent over to you all -- I mean, there wasn't the specific unanimity in each count, there was the general one, of course, earlier in the instructions. I think, [Keyes's attorney], you're saying that if [the prosecutor], during closing starts to say there's really two instances here of sexual assault, one happened in the bedroom, one happened in the living room, then you'd say, well, there ought to be -- so I don't want to micromanage or tell [the prosecutor] how to do her closing, but if -- so I think that's what you're saying, [Keyes's counsel].
>
> [KEYES'S COUNSEL]: Yeah, essentially. So that the -- in the -- in the case that I sent, the prosecutor said to the jury, you can find him guilty if you believed he possessed the drugs in the car, you can find him guilty if he possessed -- if you believe that he possessed the drugs in his wallet. And that's sort of what the -- the Court of Appeals focused on was, you know, they -- the jury should have received a specific unanimity instruction because they have to agree on what the act of possession was. But as long as it's not sort of brought up sort of that way or in a similar way, you know, it would just be that I would renew, maybe, my notion [sic] if it is.

The prosecutor then commented on how she might approach her closing statement, and Keyes's counsel replied, "I think it's another—we'll jump off that bridge if we get to it." The district court responded, "Okay. Fair enough. So perhaps enough said about that for now."

After the jury instructions were finalized—without a specific-unanimity instruction but with a general-unanimity instruction[3]—the district court asked both attorneys whether they were satisfied with the draft instructions. Both attorneys replied that they were.

After deliberating, the jury found Keyes guilty on all counts. The district court entered convictions for first-degree criminal sexual conduct, third-degree assault, and threats of violence, and sentenced Keyes to 360 months in prison.

Keyes appealed to the court of appeals, arguing that the district court erred by denying his request for a specific-unanimity instruction. *State v. Keyes*, No. A23-1400, 2024 WL 3493517, at *1 (Minn. App. July 22, 2024). Before the court of appeals he contended that "because the state introduced evidence of two instances of alleged penetration … the jury very likely reached non-unanimous verdicts on those counts." *Id.* at *3 (internal quotation marks omitted). The court of appeals affirmed Keyes's convictions in a nonprecedential decision. *Id.* at *6. It concluded that Keyes had failed to properly preserve the question of whether a specific-unanimity jury instruction was required. *Id.* at *2–3. The court of appeals also concluded that the district court did not plainly err when it failed to give a specific-unanimity jury instruction. *Id.* at *4. The court

---

[3]     The general-unanimity instruction stated, "When you reach a verdict, it must be agreed upon by all of you. In other words, your verdict must be unanimous."

of appeals reasoned that because both acts of penetration were part of a single behavioral incident, a specific-unanimity jury instruction was not required.[4] *Id.*

We granted Keyes's petition for further review.[5]

## ANALYSIS

In this case, we consider whether a district court must give a specific-unanimity jury instruction when the State charges a single count of a crime but alleges distinct acts, each of which on its own could prove the elements of the charged offense. A specific-unanimity jury instruction informs the jury that it must unanimously agree on the distinct act that proves the elements of the charged offense.

We first consider which appellate standard of review to apply here. Then, after reviewing federal and state law, we consider whether a defendant in a Minnesota state court prosecution is entitled to receive a specific-unanimity instruction. We next identify an analytical framework for determining when such an instruction is warranted. Applying that framework to the facts in Keyes's case, we determine that the district court erred by not giving the jury a specific-unanimity instruction. Finally, we address whether the error

---

[4] Keyes raised two other issues before the court of appeals. *Keyes*, 2024 WL 3493517, at *1. He argued that the district court "erred by denying his motion for an order guaranteeing him a jury trial before a fair cross-section of the community" and "abused its discretion by allowing [the State] to amend its complaint." *Id.* The court of appeals rejected both arguments. *Id.* at *5–6.

[5] In his petition for further review to this court, Keyes raised three issues: whether the district court erred in allowing the State to amend the complaint, whether the district court erred in denying his request for a specific-unanimity jury instruction, and whether any of the issues in his pro se supplemental brief warranted review. We granted review of the jury instruction issue and denied review of the other two issues.

11

prejudiced Keyes, concluding that the error was not harmless beyond a reasonable doubt and thus warrants a new trial.

I.

Before turning to the substance of the parties' arguments, we must identify our standard of review for this case. The standard we apply depends on whether Keyes requested a specific-unanimity jury instruction at trial, thereby preserving the issue before us. The parties disagree about whether Keyes asked the district court for the instruction.

According to Keyes, the record shows that his trial counsel requested a specific-unanimity instruction and the district court denied the request. Thus, Keyes argues, we should review the alleged error using the standard of review that we apply when a party requests a jury instruction and the request is denied. Generally, a district court's "[d]enial of a requested [jury] instruction is reviewed for an abuse of discretion." *State v. Schoenrock*, 899 N.W.2d 462, 466 (Minn. 2017). A district court abuses its discretion "when its jury instruction materially misstates the law when read as a whole." *Id.* Moreover, Keyes contends, the district court's denial of the requested specific-unanimity jury instruction implicated his constitutional right to a unanimous verdict. When a jury instruction issue presents an underlying constitutional question, we review the constitutional question de novo. *See State v. Bey*, 975 N.W.2d 511, 516 (Minn. 2022). Keyes asks us to review the constitutional issue de novo—without deference to the district court.

The State offers a competing interpretation of what the record shows. According to the State, Keyes's counsel withdrew the request for a specific-unanimity instruction when

the prosecutor clarified that she would not argue to the jury that the sexual assaults were distinct criminal acts. The State also notes that, although Keyes's counsel suggested that the defense might renew the request for the jury instruction, the issue was never raised again before the case was submitted to the jury. The State contends that Keyes therefore failed to preserve the issue of whether a specific-unanimity instruction was required, and we should consider the issue to be forfeited.

The forfeiture doctrine encourages defendants to object before the district court so that the district court has an opportunity to correct errors "before their full impact is realized." *State v. Thompson*, 3 N.W.3d 257, 263 (Minn. 2024) (citation omitted) (internal quotation marks omitted). Under that doctrine, when a defendant fails to request a jury instruction in the district court, we review for plain error. *State v. Zinski*, 927 N.W.2d 272, 275 (Minn. 2019). To establish plain error, an appellant must show that there was "(1) an error; (2) that is plain; and (3) the error must affect substantial rights." *State v. Kelley*, 855 N.W.2d 269, 273–74 (Minn. 2014). An error is "plain" if it is clear or obvious. *State v. Jones*, 753 N.W.2d 677, 686 (Minn. 2008). "When the defendant satisfies these requirements, an appellate court may correct the error *only* when it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Pulczinski v. State*, 972 N.W.2d 347, 356 (Minn. 2022).

Although it is a close question, we conclude that Keyes adequately preserved the issue of whether a specific-unanimity instruction was required. The record shows that Keyes's trial counsel requested a specific-unanimity instruction and that the district court denied the request. Thus, the district court had an opportunity to address the issue during

the trial. As the parties' arguments reveal, however, the subsequent exchange between the

district court, Keyes's counsel, and the prosecutor is not entirely clear as to whether

Keyes's counsel withdrew the request or whether Keyes's counsel would consider

renewing the request following the prosecutor's closing argument. Keyes's counsel,

however, never expressly withdrew the request during the exchange. And Keyes's

counsel notified the district court and the prosecutor that, if warranted, she would

"renew" the motion after the prosecutor's closing argument. Thus, on balance, we are not

convinced that Keyes's counsel withdrew the request for a specific-unanimity instruction,

and we determine that the initial request sufficiently preserved the issue. Accordingly, we

apply our standard of review for preserved errors,[6] and we review the district court's

denial of a specific-unanimity instruction for an abuse of discretion. *See Schoenrock*,

899 N.W.2d at 466.

## II.

This case presents the first circumstance in which our court has addressed the

specific-unanimity issue outside the plain error context. We thus take this opportunity to

address the specific-unanimity issue more fully than we have in other cases where the

---

[6]     The dissent argues that our determination that Keyes preserved the issue "encourages a 'double-or-nothing' strategy in future cases," whereby defendants "could strategically accept a single, all-or-nothing verdict with a general unanimity instruction on the alleged sexual assault, and, if convicted, argue on appeal that the conduct should have been considered discrete acts requiring specific unanimity." But under the hypothetical circumstances just described—where there was *no* request for a specific-unanimity instruction—plain error review undoubtedly would apply. Here, by contrast, the record establishes that Keyes's trial counsel requested a specific-unanimity instruction. The uncertainty in the record concerns the meaning of trial counsel's remarks after the district court denied the request.

issue was not properly preserved. To determine whether the district court abused its discretion by failing to provide Keyes's requested specific-unanimity jury instruction, we must first decide whether a defendant is entitled to such an instruction under Minnesota law. This requires us to examine the right to a unanimous jury and the scope of that right.

A.

The requirement for unanimous jury verdicts is rooted in two separate constitutional concerns. First, the United States Supreme Court has held that the Sixth Amendment right to a jury trial, as incorporated against the States by the Fourteenth Amendment, implicitly requires a jury's verdict to be unanimous for felony offenses. *Ramos v. Louisiana*, 590 U.S. 83, 89–93 (2020); *State v. Bey*, 975 N.W.2d 511, 517 (Minn. 2022) (citing *Ramos*, 590 U.S. at 89–90). Indeed, according to the Supreme Court, the right to a unanimous jury is "fundamental to the American scheme of justice." *See Ramos,* 590 U.S. at 93 (citation omitted) (internal quotation marks omitted); *see also Am. Pub. Co. v. Fisher,* 166 U.S. 464, 468 (1897) (explaining that "unanimity was one of the peculiar and essential features of trial by jury at the common law"). The Court recently confirmed that the jury unanimity requirement applies equally to both federal and state felony prosecutions. *Ramos*, 590 U.S. at 93.

Second, the requirement for jury unanimity safeguards the due process requirement for proof beyond a reasonable doubt of every element of an offense. *See In re Winship*, 397 U.S. 358, 363–64 (1970) (stating that due process requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged"). The requirement for unanimity does not just apply to a jury's

15

ultimate verdict in a felony case. Juries also must unanimously agree that the government has proven each *element* of an offense. *Richardson v. United States,* 526 U.S. 813, 817 (1999); *State v. Pendleton*, 725 N.W.2d 717, 730–31 (Minn. 2007).

The Minnesota Constitution likewise includes the right to an impartial jury in criminal cases, *see* Minn. Const. art. I, § 6, and a right to due process, *see* Minn. Const. art. I, § 7. Although we have historically relied on federal case law in considering plain error challenges that implicate the constitutional requirement for jury unanimity, *see, e.g.*, *State v. Ihle,* 640 N.W.2d 910, 917–19 (Minn. 2002) (applying federal case law), we have expressly incorporated a requirement for jury unanimity into our criminal procedure rules. *See* Minn. R. Crim. P. 26.01, subd. 1(5).

B.

At issue here is the role that the unanimity requirement plays in safeguarding a criminal defendant's due process right to proof beyond a reasonable doubt of every element of a charged offense. To better understand the scope of the unanimity requirement in this context—which we refer to as specific unanimity—we turn to the case law, beginning with the decisions of the United States Supreme Court.

The Supreme Court has addressed the constitutional right to jury unanimity as an enforcement mechanism for due process in two leading decisions, *Schad v. Arizona*, 501 U.S. 624 (1991), *abrogated on other grounds by Ramos v. Louisiana*, 590 U.S. 83 (2020), and *Richardson v. United States*, 526 U.S. 813 (1999). In these decisions, the Supreme Court identified the contours of the unanimity requirement by distinguishing

16

between the "means" of committing an offense (for which jury unanimity is *not* required) and the "elements" of an offense (for which jury unanimity *is* required).

In *Schad*, which is a plurality opinion,[7] the Supreme Court held that the constitutional jury unanimity requirement does not apply to the "means" of committing an offense. *Schad*, 501 U.S. at 631–632. The defendant in *Schad* was charged with committing first-degree murder, which under Arizona law could be either premeditated murder or felony murder. *Id.* at 627–28. At trial, the prosecutor presented two theories to the jury—that the evidence was consistent with both premeditated murder *and* felony murder committed during a robbery. *Id.* at 629. The trial court instructed the jury that both "murder which is the result of premeditation" and "[m]urder which is committed in the attempt to commit robbery" constituted the offense of first-degree murder. *Id.* at 629. Although the trial court instructed the jury on the general requirement for unanimity, it did not instruct the jury that it had to unanimously agree on which type of first-degree murder the defendant committed. *Id.* The jury found the defendant guilty of first-degree murder. *Id.* On appeal, the defendant argued that the jury instructions violated his constitutional right to a unanimous jury verdict. *Id.* at 630.

The *Schad* plurality affirmed the defendant's conviction. It noted that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Id.* at 632 (citation omitted) (internal quotation marks omitted). The

---

[7]     While *Schad* did not produce a majority opinion, the plurality opinion's reasoning was later relied on in a majority opinion of the United States Supreme Court and several opinions of this court. *See Richardson*, 526 U.S. at 817 (citing *Schad*); *see also, e.g.*, *State v. Crowsbreast*, 629 N.W.2d 433, 438 (Minn. 2001) (citing *Schad*).

plurality analogized this question to the "long-established rule of the criminal law that an indictment need not specify which overt act, among several named, was the means by which a crime was committed." *Id.* at 631. It observed that, under federal criminal procedure rules, an indictment can allege that the means the defendant used to commit an offense are unknown or that one or more means were used. *Id.* at 631 (citing Fed. R. Crim. P. 7(c)(1)). The plurality further reasoned that the Supreme Court had "never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone," and that "[i]n these cases, as in litigation generally, different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line." *Id.* at 631–32 (citation omitted) (internal quotation marks omitted). According to the plurality, this was equally true for alternative means of proving the required actus reus as the required mens rea, which was at issue in *Schad. Id.* at 632.

The *Schad* plurality recognized, however, that due process may limit the capacity of states to define different conduct as "merely alternative means of committing a single offense." *Id.* It identified this limit as the "axiomatic requirement of due process that a statute may not forbid conduct in terms so vague that people of common intelligence would be relegated to differing guesses about its meaning." *Id.* As an example of a statute that would violate this principle, the plurality posited that due process would not "permit a State to convict anyone under a charge of 'Crime' so generic that any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering, for example, would suffice for conviction." *Id.* at 632–33. The plurality did not

announce a rule to determine when a statute identifying alternative means for committing a crime would offend due process. *See id.* at 637. But it concluded that, under the facts presented, "the jury's options … did not fall beyond the constitutional bounds of fundamental fairness and rationality."[8] *Id.* at 645.

Eight years later, the Supreme Court decided *Richardson*, where it addressed the requirement for jury unanimity as to the elements of an offense. 526 U.S. at 816–17. The defendant in *Richardson* was convicted under a federal statute that prohibited "engag[ing] in a continuing criminal enterprise." *Id.* at 815 (alteration in original) (quoting 21 U.S.C. § 848(a)). A "continuing criminal enterprise" was defined as a violation of a law that was "part of a continuing series of violations." *Id.* (quoting 21 U.S.C. § 848(c)). To conclude that the defendant had committed a continuing series of violations, the trial court instructed the jury that it had to "unanimously agree that the defendant committed at least three federal narcotics offenses." *Id.* at 816. But the trial court further instructed the jury that jurors did not "have to agree as to the *particular* three or more federal narcotics offenses committed by the defendant." *Id.* (emphasis added). Following his conviction for engaging in a continuing criminal enterprise, the defendant appealed, arguing that the trial court's jury instruction advising that unanimity was not required as to the specific underlying offenses violated his right to a unanimous jury verdict. *Id.* at 816–17.

---

[8] In *Schad*, the plurality stated that a "state criminal defendant, at least in noncapital cases, has no federal right to a unanimous jury verdict." 501 U.S. at 634 n.5. Subsequently, in *Edwards v. Vannoy*, the Supreme Court recognized that this statement in *Schad* was no longer good law given the Supreme Court's decision in *Ramos*, which held that the unanimity requirement applies to state court prosecutions. *Edwards*, 593 U.S. 255, 265–66, 265 n.4 (2021) (citing *Schad*, 501 U.S. at 634 n.5).

According to the defendant, each underlying offense or "violation" was a separate element of the offense for which unanimity was required. *Id.* The government responded that the series of violations, and not the individual violations, was the element of the offense. *Id.* at 817–18.

To determine whether the trial court erred in its jury instruction, the Supreme Court addressed two distinct but related questions. The first question was whether the statutory phrase "series of violations" created a single offense element. 526 U.S. at 817. The second question was whether—if the statutory phrase created multiple offense elements (one for each underlying federal narcotics violation)—the jurors needed to unanimously agree that the defendant committed each of the underlying violations. *Id.* at 817–18. These questions were significant because, the Supreme Court observed, "[c]alling a particular kind of fact an 'element' carries certain legal consequences," namely, "that a jury in a federal criminal case cannot convict unless it unanimously finds that the Government has proved each element." *Id.* at 817.

The Supreme Court distinguished between "means" for committing an element of a crime and the "elements" of a crime. *Id.* It recognized that a jury "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Id.* However, unanimity is required for the elements of a crime. *Id.* To determine whether the trial court's instruction regarding the underlying offenses forming the criminal enterprise implicated the jury unanimity requirement, the Supreme Court examined the federal statute defining the offense. *Id.* at 817–18. The Supreme

Court looked to the statutory language to decide whether the underlying offenses were "means" or "elements." *Id.* at 818.

Based on the language of the statute, which used the words "violates" and "violations" to describe the underlying offenses, the Supreme Court concluded that these were separate elements of the charged offense of continuing criminal enterprise.[9] *Id.* at 818–19. Put differently, the Court answered the first question—whether the statutory phrase "series of violations" created a single offense element—in the negative. The Supreme Court was persuaded that the words "violate" and "violations" in the statute suggested that the underlying offenses were completed criminal offenses. *Id.* at 818–19. Turning to the second question, the Supreme Court determined that the individual violations were separate elements for which unanimity was required. *Id.* The Supreme Court thus concluded that the trial court's jury instruction, which did not require unanimity as to the underlying offenses, was erroneous. *Id.* at 824.

---

[9]     Federal courts have concluded that the Supreme Court in *Richardson* altered the substantive elements of the offense in question when it held that the underlying federal narcotics violations were separate elements of the charged offense of continuing criminal enterprise, such that this substantive change applies retroactively. *See, e.g.*, *Santana-Madera v. United States*, 260 F.3d 133, 139 (2d Cir. 2003) (concluding *Richardson* applies retroactively because "*Richardson* interpreted a federal criminal statute and, in doing so, changed the elements of the CCE offense. In other words, it altered the meaning of the substantive criminal law."); *United States v. Montalvo*, 331 F.3d 1052, 1056 (9th Cir. 2003) (similarly concluding *Richardson* applies retroactively because "*Richardson* restricts the class of persons who can be convicted for CCE—i.e., only those individuals who committed at least three predicate drug felonies.").

21

Although the United States Supreme Court has not addressed the requirement for jury unanimity as to the elements of a criminal offense since *Richardson*, the issue has recurred with regularity in our state courts. We next examine our state case law.

C.

An examination of our state case law reveals a patchwork of decisions applying *Schad* and *Richardson*. These cases use a variety of approaches to the specific-unanimity requirement.

The first Minnesota case to squarely address the question of whether a specific-unanimity jury instruction was required was *State v. Stempf*, 627 N.W.2d 352 (Minn. App. 2001). In *Stempf*, which was decided two years after the Supreme Court's decision in *Richardson*, the court of appeals reversed a defendant's conviction for drug possession because the district court failed to give a jury instruction requiring specific unanimity. 627 N.W.2d at 353–54. The State had charged the defendant with a single count of drug possession. *Id.* at 354. But at trial, the State presented evidence that the defendant had committed two distinct acts of drug possession: the defendant possessed methamphetamine in his workplace and the defendant possessed additional methamphetamine in a pickup truck. *Id*. Defense counsel asked the district court to provide an instruction "requiring the jurors to evaluate the two acts separately and unanimously agree that the state had proven the same underlying criminal act beyond a reasonable doubt," but the district court denied the request. *Id*. Relying on *Richardson* and "[n]ear unanimous authority" from other jurisdictions, the court of appeals reversed. *Id*. at 354–56, 359. The court of appeals observed that a "jury must unanimously agree on

which acts the defendant committed if each act itself constitutes an element of the crime." *Id*. at 355. It then examined the drug possession statute to determine the elements of the offense. *Id*. at 357. Based on the language of the statute, the court of appeals determined that the act of drug possession is an element of the crime. *Id*. Thus, it concluded, "the jury must agree unanimously on one act of possession that has been proven beyond a reasonable doubt." *Id.*

Following *Stempf*, this court considered three cases alleging that district courts had plainly erred by failing to provide specific-unanimity instructions. In *State v. Crowsbreast*, the defendant, relying on *Richardson*, argued that the predicate acts underlying the "past pattern of domestic abuse" element of first-degree domestic abuse homicide are themselves elements for the purpose of juror unanimity. 629 N.W.2d 433, 437–38 (Minn. 2001). The defendant contended that the district court had plainly erred by failing to provide a specific-unanimity instruction advising jurors that they had to unanimously agree as to the predicate acts that were proven. *Id.* Without much analysis, we rejected the defendant's argument. *Id*. at 438–39. Citing *Schad*, we held that "there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Id.* at 439 (citation omitted) (internal quotation marks omitted).

Soon after, in *State v. Ihle*, we again cited *Schad* to conclude that no specific unanimity was required regarding the three possible ways that the defendant violated the obstructing legal process statute. 640 N.W.2d 910, 912, 918 (Minn. 2002). Among other conduct, the statute prohibited intentional conduct that:

> (1) obstructs, hinders, or prevents the lawful execution of any legal process, civil or criminal, or apprehension of another on a charge or conviction of a criminal offense; [or]
>
> (2) obstructs, resists, or interferes with a peace officer while the officer is engaged in the performance of official duties;

*Id*. at 915 (quoting Minn. Stat. § 609.50, subd. 1(1), (2) (2000)). At the defendant's trial, the State alleged that the defendant either obstructed legal process by threatening an officer at a car, running away, or resisting arrest in a house while the officer was either apprehending another person or performing official duties. *Id*. at 917–18. On appeal from his conviction, the defendant argued that the district court had plainly erred by failing to provide a specific-unanimity jury instruction. *Id.* We determined that the State's alternative theories concerned alternative means, and thus, the jury was not required to unanimously agree as to the act the defendant committed or the particular statutory provision that the defendant's conduct violated. *See id*. at 918–19. Additionally, we noted that "[t]he close similarity of the conduct described by the statute, coupled with the undisputed facts regarding the purpose for the officer's presence in this case, leads us to conclude there is no risk of unfairness in not requiring unanimity." *Id*. at 919.

Finally, in *State v. Pendleton*, we relied on *Schad* to conclude that the district court did not plainly err by failing to provide a specific-unanimity instruction to the jury in the defendant's trial for kidnapping. 725 N.W.2d 717, 732–33 (Minn. 2007). Under the kidnapping statute in effect at the time of the incident, a person committed the offense of kidnapping by confining or removing another without consent and for "any of the following purposes." Minn. Stat. § 609.25, subd. 1 (2004). Those purposes were then

24

listed in the statute, separated by the word "or." *Id*. In the defendant's case, the State alleged two possible statutory purposes: "to facilitate commission of any felony or flight thereafter" or "to commit great bodily harm or to terrorize the victim or another." *Pendleton,* 725 N.W.2d at 730. Without providing a specific-unanimity instruction, the district court instructed the jury that it could find the defendant guilty if it concluded that he had "the purpose of committing great bodily harm," or "the purpose of facilitating the commission of the crime of murder," or "facilitating flight after the crime of assault in the third degree." *Id*. Following his conviction, the defendant argued that specific unanimity was required as to the purpose of the alleged kidnapping. *Id*. We disagreed. *Id*. at 732–33. Noting that "[t]he three kidnapping purposes available to the jury to prove that [the victim] was murdered while being kidnapped are not so inherently distinct as to violate due process," we concluded that the defendant had "not established a due process violation as to jury unanimity." *Id*. at 732.

Several years after our decisions in *Crowsbreast*, *Ihle*, and *Pendleton*, the court of appeals, in *State v. Infante,* articulated a new approach for distinguishing between means and elements for the purpose of specific unanimity—the single behavioral incident approach. 796 N.W.2d 349, 356–57 (Minn. App. 2011). In *Infante*, the State charged the defendant with a single count of second-degree assault for an incident that occurred over several hours. *Id.* at 352. During that incident, the State alleged, the defendant put a gun to the victim's head in a bedroom, and two or three hours later, the defendant methodically loaded the gun in the living room in the victim's presence. *Id.* at 355. Before the court of appeals, the defendant argued that the district court had plainly erred

25

by failing to give the jury a specific-unanimity instruction. *Id.* The court of appeals first observed that the defendant's acts occurred during a single behavioral incident. *Id*. at 356–57. Because the acts occurred during a single behavioral incident, the court of appeals determined that the acts were not "independent incidents," unlike the acts of drug possession in *Stempf*. *Id.* at 357. Next, the court of appeals considered the assault statute, which, under the facts presented, required proof of an act with intent to cause fear. *Id*. at 357–58. The court of appeals determined that the defendant's two acts—putting the gun to the victim's head in the bedroom and methodically loading his gun in the living room—were "means" of committing an assault and not "elements" of the offense. *Id.* at 358. In other words, the court of appeals stated, "The criminal act was the causing of fear, not the handling of the weapons; they were merely the means to a frightening end." *Id.*

Following the *Infante* decision, the court of appeals has applied the single behavioral incident approach on numerous occasions to reject the argument that a defendant was entitled to a specific-unanimity jury instruction at trial when multiple acts occurred within a single behavioral incident. *See, e.g.*, *State v. LeClair*, No. A22-0048, 2022 WL 17086648, at *4–5 (Minn. App. Nov. 21, 2022); *State v. Rulford*, No. A19-1483, 2021 WL 21501, at *2 (Minn. App. Jan. 4, 2021), *rev. denied* (Minn. Mar. 30, 2021); *State v. Kuchenbecker*, No. A17-1855, 2018 WL 4289002, at *1–2 (Minn. App. Sep. 10, 2018); *State v. Ards*, No. A15-2014, 2016 WL 7041876, at *2–3 (Minn. App. Dec. 5, 2016), *rev. denied* (Minn. Feb. 22, 2017); *State v. Covington*, No. A12-0589, 2013 WL 141691, at *3–4 (Minn. App. Jan. 14, 2013), *rev. denied* (Minn. Mar. 27, 2013). Indeed, the court of appeals concluded in Keyes's case that no

26

specific-unanimity instruction was required because, like *Infante*, the incident involved a single behavioral incident. 2024 WL 3493517, at *4. These cases reveal a wide range in how a single behavioral incident is defined, however. For example, in Keyes's case, the two alleged acts of penetration occurred within a 45-minute period in two separate rooms of the same residence. The "single behavioral incident" in *Covington* involved two distinct acts committed almost four hours apart in two different locations. 2013 WL 141691, at *5. And in *Ards*, the "single behavioral incident" included three separate acts that occurred over a nine-hour period. 2016 WL 7041876, at *2–3.

In addition to the *Infante* line of cases, the court of appeals has also developed a statute-based approach for determining whether the State's theory in a case alleges alternative "elements" of an offense or alternative "means" of committing the offense, which we consider to be more consistent with *Stempf*. In *State v. Lagred*, the State prosecuted the defendant for first-degree aggravated robbery. 923 N.W.2d 345, 346 (Minn. App. 2019). There, the defendant swung a baseball bat at the victim, hitting the victim in the head, and then demanded that the victim turn over the contents of his pockets. *Id*. at 347. The victim complied and handed over a pocketknife. *Id.* At trial, the district court instructed the jury that it could find the defendant guilty of the charged offense if it found that the defendant "was armed with a dangerous weapon or inflicted bodily harm upon [the victim]." *Id*. at 348 (emphasis omitted). Before the court of appeals, the defendant argued that "[t]he district court's instruction to the jury that [it] could convict [him] of aggravated robbery by finding that he was armed with a dangerous weapon or that he inflicted bodily harm denied him the right to a unanimous verdict." *Id*.

After examining *Schad*, the court of appeals reviewed the aggravated robbery statute. *Id*. at 350. The court of appeals determined that the plain language of the statute—which states that a person commits aggravated robbery if the person is either "armed with a dangerous weapon" or "inflicts bodily harm"—provides alternative means of committing the offense of aggravated robbery. *Id*. at 350–51 (quoting Minn. Stat. § 609.245, subd. 1). The court of appeals concluded that, consistent with *Schad*, the statute provides for alternative means of committing an aggravated robbery, and specific unanimity is not required as to means. *Id*. at 354.

The court of appeals again followed this approach in *State v. Epps*, where the defendant was convicted of first-degree criminal sexual conduct causing personal injury to the victim using force or coercion. 949 N.W.2d 474, 479–80 (Minn. App. 2020), *aff'd on other grounds*, 964 N.W.2d 419 (Minn. 2021). The State's evidence showed that the defendant sexually penetrated the victim during a struggle. *Id*. at 478–79. During closing argument, the prosecutor advised the jury that it did not have to unanimously agree as to whether the defendant used force or coercion to accomplish the sexual penetration. *Id*. at 480. The jury found the defendant guilty, and in three special verdict forms indicated that it had found the defendant used force, coercion, and both force and coercion in committing the offense. *Id*. At the court of appeals, the defendant argued that the prosecutor committed misconduct during closing argument by misstating the elements of first-degree criminal sexual conduct. *Id*. 480–81. According to the defendant, whether the defendant used force or coercion were separate elements of the offense for which jury unanimity was required. *See id*.

28

Relying on its earlier decision in *Lagred*, the court of appeals first considered the plain language of the first-degree criminal sexual conduct statute to identify the elements of the offense. *Id.* at 482. It determined that those elements are "(1) the intentional act of sexual penetration, (2) without the consent of the complainant, (3) causing personal injury to the complainant, and (4) through the use of force or coercion." *Id*. Then, the court of appeals considered whether "force" and "coercion" are themselves elements of the offense. *Id*. at 482–84. Based on the statutory language, the court of appeals concluded that "force or coercion" is one element of the offense that can be satisfied with two means—either force or coercion. *Id*.

We have not meaningfully addressed the specific-unanimity requirement since the court of appeals' development of its two lines of cases—*Infante's* single behavioral incident approach on the one hand and *Lagred* and *Epps'* statute-based approach on the other.[10]

### D.

Against this backdrop of United States Supreme Court and Minnesota decisions, and in light of the jury unanimity requirement under Minnesota Rule of Criminal Procedure 26.01, subdivision 1(5), we now consider the first question presented here: Is a defendant in a Minnesota state court prosecution entitled to a specific-unanimity jury

---

[10] In 2015, we again addressed whether the lack of a specific-unanimity instruction was plain error in *State v. Wenthe*, 865 N.W.2d 293 (Minn. 2015). We did not have any need to articulate a specific-unanimity standard in that case, however, because we held that there was no prejudice; in as much as it was not reasonably likely that there was a lack of unanimity. *Id.* at 299–301.

instruction when the State charges one count of criminal conduct but presents evidence of more than one distinct act, each of which on its own could prove the elements of the charged offense? We have not yet addressed this question, but we do so now.

When the State charges one crime but alleges multiple distinct acts, each of which on its own could satisfy the elements of the charged crime, a jury must unanimously agree on which act the defendant committed. *See Richardson*, 526 U.S. at 824 (holding that the continuing criminal enterprise statute requires unanimity as to each individual violation). A district court has an obligation to provide jurors with instructions that "fairly and adequately" state the law. *State v. Davis*, 864 N.W.2d 171, 176 (Minn. 2015) (citation omitted) (internal quotation marks omitted). Thus, we hold that when the State charges one count of a criminal offense but presents evidence of more than one distinct act, each of which on its own could satisfy the elements of the charged offense, a defendant is entitled to a specific-unanimity jury instruction. Such an instruction must advise the jury that it must unanimously agree as to the specific act that proves the elements of the charged offense.

Our holding does not impact the State's charging authority. When the State has evidence of multiple acts that could prove multiple offenses, the State has discretion to charge a single count or multiple counts. But when the State elects to charge just one count under these circumstances, the district court must grant the defendant's request for a specific-unanimity jury instruction.

III.

We next address the more difficult question presented here: How does a court determine under the particular facts of a case whether a specific-unanimity instruction is required? To answer this question, we first consider the arguments of the parties. We then consider a framework for determining whether specific unanimity is required.

A.

Keyes argues that the first-degree criminal sexual conduct offense required proof of a single act—sexual penetration. He contends that the State presented two distinct acts of sexual penetration at his trial—the act in the bedroom and the act in the living room. Keyes notes that either of these acts, on its own, could have satisfied the elements of first-degree criminal sexual conduct. According to Keyes, because the State alleged two separate acts to satisfy the elements of first-degree criminal sexual conduct, he was entitled to a specific-unanimity instruction.

Keyes further asks us to reject the single behavioral incident approach that the court of appeals has applied since *Infante*. He contends that this approach "has nothing to do with constitutional jury unanimity," observing that the term "single behavioral incident" was borrowed from the sentencing context, where it is applied to bar multiple punishments for multiple offenses that occurred during a single behavioral incident. *See State v. Degroot*, 946 N.W.2d 354, 365 (Minn. 2020) (stating that Minnesota law allows punishment for only one of the offenses that results from an act committed during a single behavioral incident that did not involve multiple victims); *see also* Minn. Stat.

31

§ 609.035. Keyes also points out that the single behavioral incident approach is not based on any federal law.

The State responds that, since *Ihle*, lower courts in Minnesota have followed the single behavioral incident approach. The State also observes that criminal sexual conduct cases often involve multiple acts committed during a single course of conduct. The State notes that in such cases a few other jurisdictions use the single behavioral incident approach. *See Gray v. United States*, 544 A.2d 1255, 1258–59 (D.C. Cir. 1988) (no specific-unanimity instruction was required in a sexual assault case where multiple instances of sexual penetration occurred in different locations over a short period of time); *State v. Lee*, 460 P.3d 701, 709–11 (Wash. Ct. App. 2020) (holding that multiple acts of penetration within a short period of time with the same victim in the same location and for the same purpose were a continuing course of conduct that did not require a specific-unanimity instruction). Thus, the State urges us to formally adopt this approach for determining whether a specific-unanimity instruction is required.

B.

With these arguments in mind, we now consider a framework for determining whether specific unanimity is required.

The court of appeals applied the single behavioral incident approach to conclude that the district court did not err when it declined to provide a specific-unanimity instruction to Keyes's jury. 2024 WL 3493517, at *4. For several reasons, we reject this approach as the framework for deciding whether specific unanimity is required.

First, the single behavioral incident approach is not founded in this court's limited specific-unanimity case law. Although the *Infante* decision suggests that we sanctioned this approach in *Ihle*, we do not read *Ihle* as adopting this approach. *Ihle* noted that the defendant's conduct occurred during a "single behavioral incident," but this observation was not dispositive. *See* 640 N.W.2d at 919. Instead, to determine whether a specific-unanimity instruction was warranted, we looked to the statute defining obstruction of legal process. *Id*. Reviewing the statute, we determined that the offense was defined by words with similar meanings: "obstructs," "hinders," "prevents," "resists," or "interferes" when an officer is attempting "execution of legal process," "apprehension," or the "performance of official duties." *Id*. (quoting Minn. Stat. § 609.50, subd. 1(1), (2) (2000)). And then, implicitly determining that the various methods of obstructing legal process were "means" of committing the offense, we concluded that it did not offend due process to include those means under the umbrella of obstructing legal process. *Id*. at 918–19. Based on our review of our case law, we have not previously embraced the single behavioral incident approach adopted by the court of appeals.

Second, the single behavioral incident approach does not accurately distinguish between "means" and "elements." Because the dispositive determination in the specific-unanimity inquiry is whether something is a means of committing an element or is an element itself, the single behavioral incident approach is not effective in this context.

Third, the single behavioral incident approach is difficult to apply and leads to inconsistent results. As noted, under the court of appeals' case law, a single behavioral

incident can involve a 45-minute encounter between two people who are continuously together. *See Keyes*, 2024 WL 3493517, at *3–4. Or it can include a nine-hour period involving several separate incidents. *See Ards*, 2016 WL 7041876, at *2–3.

Fourth, the single behavioral incident approach is not utilized by federal courts. As the State points out, a few states have adopted the approach. But we are not persuaded that the single behavioral incident approach is the prevailing approach or the approach that most closely aligns with the United States Supreme Court's decisions in this area.

The Supreme Court's decisions in this area—*Schad* and *Richardson*—both counsel that the inquiry as to whether something is an element that requires unanimity or simply a means of committing an element must begin with the statute defining the offense. *See Schad*, 501 U.S. at 635–36 ("The question whether statutory alternatives constitute independent elements of the offense therefore does not, as the dissent would have it, call for a mere tautology; rather, it is a substantial question of statutory construction."); *Richardson*, 526 U.S. at 817–18 (interpreting the statute to determine whether the term "series of violations" was one element of the offense or multiple elements for the purpose of jury unanimity). The framework that most closely aligns with these decisions is the one that the court of appeals applied in *Stempf*, *Lagred*, and *Epps*: interpreting the statutes defining the charged offenses to identify the elements, parsing out any means specified for committing those elements, and then considering whether the alleged conduct consisted of distinct acts, each of which could satisfy the elements of the charged offenses on its own. We now adopt that framework for deciding whether a specific-unanimity jury instruction is required in cases where the State charges one count of

34

criminal conduct but presents evidence of more than one distinct act that proves the elements of the charged offense.

The first step is to identify the elements of the offense. This requires considering the statute defining the offense. In some cases, the elements of an offense may readily be discernible from the plain language of the statute. But in cases where they are not, a court may need to resort to further statutory interpretation.

As part of this process, a court should distinguish any statutory means for committing the elements from the elements themselves. Whether something is a means of committing an element may be determined from the language of the statute. *See, e.g.*, *Epps*, 949 N.W.2d at 482 (reasoning that statutory language suggested the Legislature's intent to make force *or* coercion alternative means of accomplishing penetration under the first-degree criminal sexual conduct statute).

Once the elements have been identified using the statutory language, the second step of the analysis requires a court to consider the facts that the State alleged at trial to prove a violation of the statute. At this step of the analysis, a court must inquire whether the State alleged a single act to satisfy the elements of the statute or multiple distinct acts, each of which on its own could satisfy the elements of the statute. *See Stempf*, 627 N.W.2d at 357–58 (considering the conduct that the State charged after identifying the elements of drug possession and determining that there were two acts that each could satisfy the element of possession). If the State presented evidence of more than one distinct act, each of which on its own could independently satisfy the elements of the statute, then the jury must unanimously agree on which distinct act the defendant

35

committed. When the State has alleged *more* than one such act and has charged just *one* count, then a specific-unanimity jury instruction is required.

Because the facts of each case are different, the inquiry as to whether a specific-unanimity instruction is required must be made on a case-by-case basis. In close cases—when it is difficult to discern whether a statutory provision is an element of an offense or a means of committing an element, or whether the State has alleged more than one distinct act—a district court may decide to err on the side of caution by giving a specific-unanimity instruction.

As noted, the approach we have announced here is consistent with the Supreme Court's case law and with several Minnesota decisions. It is also similar to the framework used by federal courts. *See United States v. Morris*, 131 F.4th 1288, 1293–94 (11th Cir. 2025) (using statutory interpretation to determine whether jury unanimity was required for a firearms charge); *United States v. Brown*, 125 F.4th 1186, 1207–09 (D.C. Cir. 2025) (interpreting statute and concluding that language—"forcibly assaults, resists, opposes, impedes, intimidates, or interferes"—identifies alternative means rather than elements for the purpose of specific unanimity); *United States v. Chaoqun*, 107 F.4th 715, 725 (7th Cir. 2024) ("Whether a particular fact is an element of the crime (requiring jury unanimity) or simply an underlying fact proving an element (not requiring unanimity) is a question of statutory interpretation, legal tradition, and potential for unfairness to the defendant."); *United States v. Crump*, 65 F.4th 287, 297–98 (6th Cir. 2023) (identifying the element in the charged statute as "possession" and concluding that actual possession and constructive possession were means of committing that element); *United States v.*

36

*Gonzalez*, 905 F.3d 165, 185–86 (3d Cir. 2018) (considering language of statute to identify whether the alleged acts were elements of the offense for the purpose of a specific-unanimity jury instruction); *United States v. Barai*, 55 F.4th 1245, 1250 (9th Cir. 2022) (interpreting statute to determine whether the listed alternatives in the forced labor statute are elements or means for the purpose of a specific-unanimity jury instruction); *United States v. Kearn*, 863 F.3d 1299, 1310–11 (10th Cir. 2017) (interpreting statutes and determining that statutory language "any visual depiction" did not require specific unanimity as to which visual depictions the defendant possessed); *United States v. Nicolaou*, 180 F.3d 565, 571–72 (4th Cir. 1999) (assessing the plain language of the statute to determine whether a fact was an element for the purpose of specific unanimity); *United States v. Correa-Ventura*, 6 F.3d 1070, 1082 (5th Cir. 1993) (stating that, in deciding whether to instruct a jury that it must agree "in predicate facts as well as in result," a district court should consider "[s]tatutory language and construction, legislative intent, historical treatment of the crime by the courts, duplicity concerns with respect to defining the offense, and the likelihood of jury confusion in light of the specific facts presented".); *United States v. Verrecchia*, 196 F.3d 294, 299 (1st Cir. 1999) (interpreting the statute defining the charged offense to determine whether a fact was an element of the offense).

The dissent highlights the difficulties that prosecutors face in charging and proving criminal sexual conduct cases and advocates for a more flexible approach to jury unanimity. We acknowledge the concerns the dissent identifies. But we are convinced that the framework we have adopted will be easier for district courts and parties to apply, will

more faithfully protect the right to jury unanimity in Minnesota state court prosecutions, and will result in fewer post-trial challenges to specific unanimity and retrials.[11]

## IV.

Having adopted a framework for determining whether a specific-unanimity jury instruction is warranted in Minnesota state court prosecutions, we now apply that framework to the facts here. We must decide whether the district court abused its discretion when it denied Keyes's request for a specific-unanimity jury instruction. Keyes

---

[11] The dissent's proposed test is derived from case law from other jurisdictions addressing "duplicitous" charging. "Duplicity occurs when two or more offenses are charged in a single count of the accusatory instrument." *State v. Douglas C.*, 285 A.3d 1067, 1078 (Conn. 2022) (citation omitted) (internal quotation marks omitted). The dissent's proposed approach requires a district court to consider:

> whether alleging multiple acts in a single charge resulted in inadequate notice to the defendant of the State's theory of liability or created a genuine risk that a general verdict of guilty would conceal non-unanimous factual findings about which act satisfies an element of the offense in light of the statutory language, 'the specific facts presented,' and the State's characterization of the acts at trial.

Under the dissent's approach, a district court may also consider "the effect that charging multiple acts under one count versus bringing multiple separate counts might have on appropriate punishment."

We are concerned that this approach would not adequately safeguard specific unanimity as to each element of a criminal offense. Moreover, in our view, the dissent's proposed approach would be challenging for district courts to consistently apply. Finally, the focus in the duplicity line of cases that the dissent relies on is whether a convicted defendant was prejudiced by duplicitous charges when no specific-unanimity jury instruction was provided at trial. *See Douglas C.*, 285 A.3d at 1085 (stating that a duplicitous charge "may be cured by … a specific unanimity instruction"). We conclude that it is preferable for a district court to determine *before* a case is submitted to a jury whether a specific-unanimity jury instruction is required. This practice will better protect the specific-unanimity right, will avoid additional appeals, and will result in fewer retrials. We also note that providing a jury with a specific-unanimity instruction when appropriate places a de minimis burden on district courts.

argues that the instruction was required because the alleged sexual penetration in the bedroom and the alleged sexual penetration in the living room were two distinct acts, either of which on its own could prove the elements of first-degree criminal sexual conduct. He contends that the jury was therefore required to unanimously agree as to which act occurred to find him guilty. The State argues that the district court did not err in failing to provide a specific-unanimity instruction. In support of its argument, the State maintains that the instances of sexual penetration occurred during a single behavioral incident. Alternatively, the State contends that because the two instances of penetration occurred close in time, "[c]ommon sense dictates that this assault was one event for unanimity purposes." Because we rejected the State's arguments in Parts II and III, Keyes has the stronger position.

Under the framework we have adopted, we must first identify the elements of first-degree criminal sexual conduct by interpreting the applicable statutes. Here, the parties seemingly agree that the relevant elements of that offense, as identified by the applicable statutes, are (1) the defendant engages in sexual penetration, which includes sexual intercourse, cunnilingus, fellatio, or anal intercourse and (2) without the complainant's consent.[12] *See* Minn. Stat. § 609.341, subd. 12 (2020) (defining sexual penetration, as

---

[12] Unlike the Supreme Court's *Richardson* decision, our decision here does not alter the substantive elements of first-degree criminal sexual conduct. *See Richardson*, 526 U.S. at 818–19.

relevant here, as "any of the following acts committed without the complainant's consent," including "sexual intercourse, cunnilingus, fellatio, or anal intercourse").

Next, we consider the facts that the State alleged during Keyes's trial. Specifically, we must determine whether the State alleged more than one distinct act that could, on its own, prove the elements of first-degree criminal sexual conduct.

The act alleged was that Keyes engaged in nonconsensual fellatio with S.B. Evidence of nonconsensual fellatio would satisfy the elements of first-degree criminal sexual conduct. *See* Minn. Stat. § 609.341, subd. 12(1) (2020).

Keyes argues that the State alleged *two* distinct acts of nonconsensual fellatio during his trial—one act in the bedroom and one act in the living room—either of which on its own could prove the elements of first-degree criminal sexual conduct. He points out that S.B. testified that Keyes initially forced his penis into her mouth while they were in the bedroom. Following the act in the bedroom, S.B. testified, they moved to the living room, where Keyes forced his penis into her mouth for a second time.[13] Although these incidents occurred within a relatively short period of time, Keyes argues that S.B.'s testimony clearly referenced two separate acts of nonconsensual fellatio.

The State acknowledges that S.B. described two separate acts of nonconsensual fellatio during her testimony: "Keyes's relentless and sustained assault against SB was a

---

[13]     Keyes's brief states that the "ancillary facts" regarding the circumstances of the alleged sexual penetration "did not differentiate those two acts [of alleged penetration], because SB alleged that each time Keyes made her perform fellatio, she was in fear of great bodily harm, he used force, and he used coercion and inflicted personal injury upon her."

single incident that involved *two instances* of sexual penetration." (Emphasis added.) But the State argues that the multiple penetrations occurred during an "ongoing physical and verbal assault" and "[t]he criminal objectives for both penetrations were plainly identical."

Although the State correctly points out that the two alleged acts occurred during a single violent episode, the relevant question for determining whether specific unanimity was required is whether the State's evidence alleged *more than one distinct act of nonconsensual sexual penetration*. There is no dispute that the State's evidence alleged two distinct acts of nonconsensual sexual penetration, either of which on its own could have proved the elements of first-degree criminal sexual conduct.[14]

Because the State alleged two distinct acts, either of which on its own could prove the elements of first-degree criminal sexual conduct, a specific-unanimity instruction was required. The district court should have instructed the jury that unanimous agreement was necessary as to which of the two acts Keyes committed. Because the district court denied Keyes's request for such an instruction, we conclude that the district court abused its discretion. *See State v. Kuhnau*, 622 N.W.2d 552, 558 (Minn. 2001) (determining that the district court abused its discretion by denying the defendant's requested jury instruction when the resulting jury instructions did not fairly and adequately explain the law of the case).

---

[14]    Given the State's concession that S.B. alleged two separate acts of sexual penetration, we do not independently address whether there was more than one distinct act alleged to satisfy the sexual penetration element of the offense.

V.

Finally, we must decide whether a new trial is required. When, as here, a district court's instructional error implicates a defendant's constitutional rights, reversal is required unless the State establishes that the error was harmless beyond a reasonable doubt. *See State v. Segura*, 2 N.W.3d 142, 167 (Minn. 2024) (considering whether district court's error in providing an instruction that allowed conviction without requiring proof of all necessary legal elements was harmless beyond a reasonable doubt). "An error in jury instructions is not harmless and a new trial should be granted if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *Kuhnau*, 622 N.W.2d at 558–59.

In *State v. Wenthe*, we stated that a district court's failure to provide a specific-unanimity instruction prejudices a defendant if it is reasonably likely that some jurors believed one act proved the charged offense, while other jurors believed that another act proved the charged offense. 865 N.W.2d 293, 300 (Minn. 2015). Reversal is thus required here unless the State has established, beyond a reasonable doubt, that it is *not* reasonably likely that some jurors believed that Keyes sexually penetrated S.B. in the bedroom, but not the living room, while other jurors believed that Keyes sexually penetrated S.B. in the living room, but not the bedroom.

Keyes argues that the State cannot sustain its burden. He notes that S.B.'s account of the sexual assaults shifted over time. In her initial report to law enforcement, S.B. did not allege any sexual assault. During a second interview with law enforcement, S.B. alleged that Keyes had forced her to perform a single act of fellatio in the living room.

42

But she did not mention the children interrupting the incident as she did during her trial testimony; she said that she had defended herself with candlesticks. S.B. also described a single instance of fellatio when she spoke with law enforcement for a third time and when she gave a statement to a sexual assault nurse. Only at trial did S.B. allege a second act of fellatio—the incident in the bedroom.

The State contends that Keyes was not prejudiced by the district court's failure to provide a specific-unanimity instruction. According to the State, the two incidents of penetration "were virtually indistinguishable except that one occurred in SB's bedroom and the other in her living room." The State also observes that the prosecutor did not distinguish between the two acts during closing argument. And the State notes that Keyes did not present separate defenses to the two acts.

The question of prejudice is close. But we cannot say beyond a reasonable doubt that the error had no significant impact on the jury's verdict. Based on the record and the charges, the State has not established beyond a reasonable doubt that it is not reasonably likely that some jurors believed that Keyes sexually penetrated S.B. in the bedroom, but not the living room, while other jurors believed that Keyes sexually penetrated S.B. in the living room, but not the bedroom.

Keyes's trial counsel relied heavily as a trial strategy on the fact that S.B. alleged the second instance of sexual penetration for the first time during her trial testimony. In addition to cross-examining S.B. about the new allegation of a second instance of sexual penetration, Keyes's counsel highlighted this information in closing arguments. Keyes's counsel argued, "And then for the first time in her testimony, she says that more than one

instance of oral penetration happened. That's not a minor detail.… That is a huge change in information." Based upon this, it is reasonably likely that some jurors believed that only one instance of sexual penetration occurred. Given the fact that the incident in the bedroom was mentioned for the first time at trial, it is reasonably likely that some jurors believed that S.B. was sexually penetrated in the living room but not in the bedroom. But in light of Keyes's arguments that S.B.'s testimony surrounding the living room incident continued to change and evolve, we cannot say that the State has established beyond a reasonable doubt that it is not reasonably likely that some jurors only believed S.B.'s testimony about the bedroom incident.

Because we cannot conclude, beyond a reasonable doubt, that the district court's error in failing to provide a specific-unanimity instruction had no significant impact on the jury's verdicts, the error was not harmless. We therefore reverse Keyes's conviction for first-degree criminal sexual conduct and the jury's additional two guilty verdicts for these offenses and remand for a new trial on those offenses.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

44

DISSENT

MOORE III, Justice (dissenting).

Today, the court overturns Keyes's first-degree criminal sexual conduct conviction based on an instructional omission the defendant chose not to pursue at trial. In doing so, the court effectively treats as "plain" an error that was not apparent under then-existing law and finds prejudice where the defendant's own trial strategy leaves none to be found. That is not a faithful application of our law surrounding appellate review; it is a revision of it.

The case the court describes—a prosecution presenting distinct, competing factual theories of sexual assault—bears little resemblance to the case the jury heard. The charged conduct arose from a brief, continuous course of events in a single location, and the State presented it accordingly. The defense, for its part, did not ask the jury to parse discrete acts or to distinguish between them; it argued that none of the alleged conduct occurred. This record provides no sound basis to conclude that jurors may have disagreed about which act supported the conviction, and thus no basis to find either plain error or resulting prejudice. Crucially, even if some jurors theoretically could have disagreed about where in S.B.'s home and when and for how long Keyes forcibly penetrated her during a nearly continuous 45-minute assault, all twelve jurors agreed unanimously that the State proved the sexual penetration element of the charged offense beyond a reasonable doubt. By reversing nonetheless, the court effectively uses what should be a discretionary safeguard to create a novel formalistic approach for jury unanimity and applies it retroactively to upset a conviction obtained without objection. It thus

transforms plain-error review into a vehicle for imposing unrequested and unsettled instructional requirements after the fact. And neither our cases nor those of the United States Supreme Court compel this illogical and unjust result.

Procedure is far from my only concern here, however. In my view, the court's newly announced, categorical separate acts rule overreads precedent, exceeds the requirements of due process, and affords Keyes a second bite at the apple based on a risk he deliberately embraced at trial.[1] It will also create ongoing harm to victims. This new approach to verdict specificity undermines the finality of jury verdicts and jeopardizes victims' already-precarious access to justice in cases that are notoriously difficult to prosecute effectively: those involving criminal sexual conduct. Today's decision allows Keyes—who never objected to the jury instruction he now claims was erroneous—to go double-or-nothing, while forcing S.B.—who the jury unanimously agreed Keyes sexually assaulted—to once *again* re-live the trauma of her assault by testifying yet a third time. In future cases, this decision allows, and may even compel, nonsensical charging decisions by the State. And perhaps most importantly, it disregards the scientifically demonstrated effects of trauma on memory, with troubling implications for criminal sexual conduct cases relying primarily on the victim's testimony. The law does not dictate these

---

[1]     Allowing Keyes to remain silent on this issue after closing arguments only to raise it on appeal seemingly encourages a "double-or-nothing" strategy in future cases. Defendants could strategically accept a single, all-or-nothing verdict with a general unanimity instruction on the alleged sexual assault, and, if convicted, argue on appeal that the conduct should have been considered discrete acts requiring specific unanimity. I am concerned that today's decision implicitly countenances that strategy.

outcomes, and even the majority's new formalistic framework arguably does not require specific unanimity here.

To be clear, I agree with the court that the single behavioral incident test used by the court of appeals since *State v. Infante* may not adequately protect the constitutional right to a unanimous jury verdict in some circumstances and should, in the appropriate case, be reevaluated. And I have no quarrel with the court's reaffirmation of the unanimity requirement's importance in safeguarding defendants' due process rights by requiring proof beyond a reasonable doubt of every element of a criminal offense. However, as I discuss below, those rights can be protected by a more functional approach for jury unanimity that hews more closely to the fundamental due process rationale underlying the specific-unanimity requirement and also accounts for contextual differences between different types of criminal offenses. My preferred approach considers how the State's charging decisions affect the defendant's ability to understand and defend against the charges and any appropriate punishment. And it considers not only the theoretical possibility of non-unanimity, but also the actual risk of non-unanimity and juror confusion in light of the State's evidence and arguments at trial.

For those reasons, I respectfully dissent. I begin by examining the record to explain why Keyes forfeited appellate review of the specific-unanimity issue and to show that he cannot meet the requirements of our plain-error doctrine considering the evidence and arguments presented at trial. Next, I discuss the reasoning of the United States Supreme Court's verdict-specificity decisions in *Schad v. Arizona*, 501 U.S. 624 (1991), *abrogated on other grounds by Ramos v. Louisiana*, 590 U.S. 83 (2020), and *Richardson*

*v. United States*, 526 U.S. 813 (1999), to explain why they do not compel the court's "separate acts" rule. I then outline an alternative—and, in my view, superior—framework for analyzing verdict specificity issues developed by other jurisdictions and apply it to this case. Next, I explain why, even under the court's new approach, the criminal sexual conduct charge here can be understood as a course-of-conduct offense that does not require a specific-unanimity instruction. Finally, I survey scientific studies on how trauma affects memory and connect that research to principles of witness credibility to show how the court's new rule will negatively affect victims in future cases.

A.

Generally, "[a] party is prohibited from assign[ing] as error any portion of the charge or omission unless the party objects to the instructions before they are given to the jury." *State v. Pendleton*, 725 N.W.2d 717, 730 (Minn. 2007) (alterations in original) (citation omitted) (internal quotation marks omitted). Since Keyes did not renew his request for a specific-unanimity instruction before closing arguments or object to the general-unanimity instruction given, he has forfeited appellate review of the district court's alleged error. Our review in this case is therefore limited by the plain-error doctrine described by Minn. R. Crim. P. 31.02, which states that "[p]lain error affecting a substantial right can be considered by the court … on appeal even if it was not brought to the trial court's attention." But to obtain relief on appeal, Keyes must establish (1) error (2) that is plain, and (3) that affects his substantial rights. *State v. Wenthe,* 865 N.W.2d 293, 299 (Minn. 2015). Keyes bears the "heavy burden" to show that any error in this case affected his substantial rights. *State v. Griller*, 583 N.W.2d 736, 741 (Minn. 1998). If

a defendant fails to establish that the claimed error affected his substantial rights, we need not consider the other factors. *State v. Goelz*, 743 N.W.2d 249, 258 (Minn. 2007). And *even if* those three prongs are met, we may provide relief only if the error must be addressed to ensure the "fairness, integrity, or public reputation of judicial proceedings." *Wenthe,* 865 N.W.2d at 299 (quoting *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn. 2001)).

Here, the court of appeals appropriately evaluated Keyes's unanimity claim under the plain-error doctrine because "Keyes never specifically requested a specific-unanimity instruction, the district court never ruled on the issue, and Keyes failed to request the instruction after closing arguments." *State v. Keyes*, A23-1400, 2024 WL 3493517, at *3 (Minn. App. July 22, 2024). This is a fair characterization of the record, which confirms that, although Keyes did raise the specific-unanimity issue generally earlier in the trial, he did not specifically ask for a specific-unanimity instruction then, and therefore the district court did not explicitly rule on whether to include a specific-unanimity instruction in the final jury instructions. Keyes also did not object to the prosecutor's later statement that the final instructions given to the jury should not include a specific-unanimity instruction because the State intended to characterize the assault as a single behavioral incident in its closing argument. And Keyes once again did not object to the lack of a specific-unanimity instruction in the final jury instructions after the parties gave closing arguments. *Cf. Pendleton*, 725 N.W.2d at 730 (noting that a party forfeits appellate review of an alleged instructional error "unless the party objects to the instructions before they are given to the jury").

In fact, Keyes's attorney appeared to make a deliberate decision to wait and see how the prosecution would describe Keyes's alleged acts in closing arguments before deciding whether to pursue the request for the instruction. And, instead of doing so, Keyes's attorney relied on the allegations of multiple acts to undercut S.B.'s credibility in support of his primary defense. Keyes's contention that he preserved the jury instruction issue is highly dubious under these circumstances. If he did not, we could only consider his claim under the plain-error exception to our forfeiture doctrine.

But here, we need not even decide whether the district court erred[2] and whether that error was plain[3] because Keyes has not met his "heavy burden" of establishing that he was prejudiced by any omission of a specific-unanimity jury instruction. Therefore, his substantial rights were not affected. The following facts show why. The jury heard

---

[2] The court concludes that the district court not only erred, but *abused its discretion*. On this record, that conclusion is striking. Keyes specifically told the district court he would wait to re-raise the specific-unanimity issue until after closing arguments so he could assess how the State characterized the multiple alleged acts. But after the State referred generally to "forced oral sex" in closing argument—without distinguishing between the two alleged acts—Keyes neither requested a specific-unanimity instruction nor objected to the general-unanimity instruction ultimately given to the jury. Yet the court concludes that the *only* permissible exercise of the district court's discretion was to sua sponte provide a specific-unanimity instruction in its final charge to the jury, even though nothing in the State's closing argument could reasonably have confused the jury about the facts constituting the penetration element of the offense. In my view, however, the district court acted well within its discretion in concluding that Keyes had forfeited the specific-unanimity issue by the time final instructions were given.

[3] In my opinion, any error by the district court would not have been plain given the court of appeals' precedential decision in *State v. Infante*, 796 N.W.2d 349, 357–58 (Minn. App. 2011), which found no entitlement to a specific-unanimity instruction because the two actions from a defendant in committing a single count of second-degree assault were part of a single behavioral incident, as opposed to separate "distinct acts."

testimony from S.B. that Keyes, her domestic partner, knocked her to the ground in her bedroom, repeatedly punched her in the head while sitting on her back, and then forced his penis into her mouth. S.B. then testified that, after moving to the living room couch, Keyes put his arm around her neck and tried to strangle her, continued punching her, and then forced his penis into her mouth again. The assault continued unabated until S.B.'s nieces and nephew entered the living room. The entire incident lasted about 45 minutes. The jury was asked to decide whether, based on this evidence, Keyes committed the crime of first-degree criminal sexual conduct by engaging in nonconsensual sexual penetration with S.B.—specifically fellatio—through use of force or personal injury. The jury was *not* asked to decide whether the nonconsensual sexual penetration occurred in the bedroom or living room of S.B.'s home. After deliberating, the jury found Keyes guilty, concluding that Keyes forced S.B. to fellate him nonconsensually *at least* once during the 45-minute assault that occurred in her home. Crucially, even if six jurors thought forced penetration occurred in the bedroom but not the living room and the other six thought forced penetration occurred in the living room but not the bedroom, all twelve jurors would have unanimously agreed that Keyes committed at least one offense during this relatively brief window beyond a reasonable doubt. Yet the majority reverses Keyes's conviction because it is *theoretically* possible that at least one juror could not say for sure, based on S.B.'s testimony, when in that narrow timeframe and where in the house that occurred. That result is perplexing, both logically and doctrinally.

The court's brief harmless-error analysis appears to rely on *State v. Wenthe* for the proposition that an omission of a specific-unanimity instruction prejudices the defendant

if it is "reasonably likely" that some jurors believed one act proved the charged offense, while others believed a different act proved the charged offense. *See* 865 N.W.2d at 300. As a general matter, I agree with that proposition, at least when the two acts are factually or legally distinct. But, as I discuss below, this case is far removed from *Wenthe*. There, the State presented evidence of multiple different *completed offenses* that could have occurred up to two months apart. *Id.* at 298–99. It did not charge the single-act offense at issue *until the day of trial* and then proceeded to expressly tell the jury it could return a guilty verdict on that charge if it believed that *any one* of those violations occurred. *Id.* Yet, despite the "very troubling" charging decisions and presentation of evidence in that case—none of which happened here—we *still* held that the lack of a specific-unanimity instruction did not affect the defendant's substantial rights under the circumstances. *Id.* at 299. Given these important distinctions, Keyes cannot show a reasonable likelihood that the alleged instructional error prejudicially affected the jury's verdict under any reasonable reading of *Wenthe*. Thus, because Keyes cannot meet the requirements of our plain-error exception, we should not reverse his conviction based on a claim he forfeited at trial.

B.

Turning to the merits, the court's extensive analysis of *Schad* and *Richardson* somehow arrives at a conclusion found nowhere in either case. On their own terms, these cases do not support the court's conclusion that the Constitution *invariably* requires a specific-unanimity instruction whenever "the State charges one crime but alleges multiple

distinct acts, each of which on its own could satisfy the elements of the charged crime." *Supra*, at 30.

Under *Schad* and *Richardson*, the possibility of jury disagreement as to the facts underlying an element of the offense are only constitutionally relevant to the extent that possibility affects the fundamental due process requirement that the State must prove each element of the offense beyond a reasonable doubt. Keyes contends that the Due Process Clause only imposes vagueness limits on defining criminal conduct that are independent of a defendant's right to a specific-unanimity instruction. But that gets it backwards. Due process is not a peripheral concern that arises only after courts apply a judicially constructed elements-versus-means test to determine whether a specific-unanimity instruction is required. Rather, these cases show that the right to a specific-unanimity instruction *derives* from the due process requirement that the prosecution prove every element beyond a reasonable doubt. Under *Schad* and *Richardson*, specific-unanimity issues arise only when a criminal statute itself could be interpreted as prohibiting conceptually distinct types of criminal conduct. So, put differently, a specific-unanimity instruction is required only when the State's *interpretation of the statute*, as reflected in the jury instructions, could dilute its ultimate burden of proof by allowing different jurors to make different factual findings as to an element of the offense while still returning a unanimous guilty verdict. *Schad* and *Richardson* require nothing more. None of our cases—and indeed none of the individual United States Supreme Court justices who considered *Schad* and *Richardson*—advanced the bright-line separate acts approach the majority adopts.

Start with *Schad*. That case affirmed the defendant's conviction for first-degree murder even though the State's arguments and final jury instructions did not require the jury to agree on whether the defendant committed premeditated murder or felony murder while committing a robbery. 501 U.S. at 627. To explain this conclusion, the plurality wrote:

> Petitioner's jury was unanimous in deciding that the State had proved what, under state law, it had to prove …. [D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly *there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict*.

*Schad*, 501 U.S. at 630–32 (emphasis added) (citation omitted) (internal quotation marks omitted). For the plurality (and Justice Scalia in concurrence), the State's charging decisions and jury instructions did not even *implicate* the concept of jury unanimity; rather, the issue for the Court was "the permissible limits [on statutes] *defining* criminal conduct." *Id.* at 631 (emphasis added).

All nine justices found those limits in the Due Process Clause. To the plurality, the key inquiry was whether the relevant criminal statute and the State's charges allowed the defendant "to understand with some specificity the legal basis of the charge against him." *Id.* at 632–33. That depended on whether "differences between means become so important that they may not reasonably be viewed as alternatives to a common end, but must be treated as differentiating what the Constitution requires to be treated as separate offenses." *Id.* at 632–633. Contrary to the rigid analytical framework the court adopts here, *Schad* specifically noted "the impracticability of trying to derive any single test for the level of definitional and *verdict* specificity permitted by the Constitution." *Id.* at 637

(emphasis added). Rather, "instead of such a test our sense of appropriate specificity is a distillate of the concept of due process with its demands for fundamental fairness."[4] *Id.*

Justice Scalia's concurrence in *Schad* more explicitly introduced the elements-versus-means distinction later adopted in *Richardson* but went even further than the plurality. He noted that "it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission …. That rule is not only constitutional, it is probably *indispensable* in a system that requires a unanimous jury verdict to convict." *Id.* at 649–50 (Scalia, J., concurring) (emphasis added) (citations omitted). To be sure, Justice Scalia expressed unanimity concerns with hypothetical "umbrella crimes" comprising two conceptually distinct offenses (e.g., a single offense prohibiting both robbery and tax fraud). *Id.* at 650 (Scalia, J., concurring). But he would have held that *even the plurality's fundamental fairness test* was unnecessary in *Schad* because a first-degree murder statute listing premeditated murder and felony murder as alternative bases for liability had ample historical precedent. *See id.* at 650–51 (Scalia, J., concurring).

*Richardson* may have applied a more formal analysis, but its reasoning does not meaningfully depart from *Schad*'s. *Richardson* stands for the (rather unremarkable)

---

[4]     Although Justice White's dissent reached a different result for the reasons discussed below, he, too, focused on whether "the general jury verdict returned against the petitioner meets the requirements of due process." *Id.* at 652 (White, J., dissenting). The dissent characterized the constitutional issue as whether "rudimentary due process" allows the State to define distinct offenses with disparate elements as the same crime through its "legislative choices." *Id.* at 658 (White, J., dissenting).

proposition that determining the elements of a crime is a matter of statutory interpretation: the "legal consequence[]" of interpreting a term as an element is that "a jury … cannot convict unless it unanimously finds that the [State] has proved" the facts comprising that element. 526 U.S. at 817–18. *Richardson* recognized, however, that a jury "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element." *Id.*

The Court in *Richardson* applied something that looks, from a distance, like the framework the majority adopts, but only because of the unique nature of the statute at issue in that case. The criminal enterprise statute in *Richardson* criminalized a "continuing series of violations" of *other* federal drug crimes. *Id.* at 815 (quoting 21 U.S.C. § 848(c)). The Court interpreted this "continuing series" language to mean that each predicate violation was an element that the government had to prove beyond a reasonable doubt, rather than merely a varied means of satisfying a single "series" element. *Id.* at 818–19.

Still, *Richardson* grounded this conclusion in the same fundamental fairness and due process concerns that animated the *Schad* plurality opinion. The Court reasoned that the criminal enterprise statute's breadth "argue[d] against treating each individual violation as a means." *Id.* at 819. Interpreting the series language as defining a single element would have allowed the government to prove that element with dozens of possible, diverse predicate drug crimes, some far more serious than others, which "aggravate[d] the dangers of unfairness." *Id.* Especially when the government presents evidence of a large number of predicate violations, jurors could in theory convict under

the criminal enterprise statute without agreeing *which* of a wide variety of independent, completed crimes the defendant actually committed (and when). In other words, that interpretation could conceal "wide disagreement among the jurors about just what the defendant did, or did not, do." *Id.* Noting that the Due Process Clause "limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means, at least where that definition risks serious unfairness," *id.* at 820, the Court invoked the canon of constitutional avoidance to conclude that the individual violations—not the series they comprise—were elements of the criminal enterprise offense. *See id.* at 820 ("We have no reason to believe that Congress intended to come close to, or to test, those constitutional limits when it wrote this statute.").

If this analysis seems different from the majority's approach, that's because it is. *Richardson* says nothing about whether the State alleging multiple, related acts that could each individually satisfy an element of a more garden-variety criminal offense implicates the same unanimity concerns. *Richardson* simply did not consider a situation where the government could prove the actus reus element of a single offense with evidence of two related acts involving the *same* means. Rather, the Court's concern with the government's interpretation was that an element could be satisfied by dozens of substantively different *completed offenses* in the United States Criminal Code, each of which had dramatically different elements that would require proof beyond a reasonable doubt if charged individually. *Id.* at 819. In fact, *Richardson* explicitly *distinguishes* cases about sexual assault and sexual abuse statutes that permit jury disagreement about specific incidents so long as the State establishes a "continuous course of conduct." *Id.* at 821. In that

comparison, the Court noted that, like our criminal sexual conduct statute, those statutes "do not define the statutory crime in terms that require the commission of other predicate crimes by the defendant." *Id.* And as the Court rightly recognized: "The state practice [in sexual abuse cases] may well respond to special difficulties of proving individual underlying criminal acts, which difficulties are absent here …. [T]heir special subject matter indicates that they represent an exception." *Id.* (citation omitted).

Still, the court relies on *Richardson* for a per se rule that the State presenting evidence of multiple acts that could independently satisfy an element of a single charged offense violates the defendant's right to a unanimous jury unless a specific-unanimity instruction is given. *Schad* and *Richardson* do not forbid this approach, but, as the federal courts of appeals have made clear, they do not require it either. *Cf. United States v. Correa-Ventura*, 6 F.3d 1070, 1081–82 (5th Cir. 1993) (observing that "defining unanimity in terms of 'separate offenses' or 'separate crimes' would result in an unworkable 'brightline' test" because "factual concurrence must be viewed on a case-by-case basis" to ensure "that the purposes of unanimity are satisfied").

To the contrary, other courts explicitly recognize that determining whether statutory language reasonably contemplates alternative means of satisfying an element or instead defines conduct that must constitutionally be treated as separate offenses "implicates different concerns" from those raised when a defendant is convicted on a single count based on evidence of multiple, separate acts that violate the statute— commonly referred to as a "duplicitous" charge. *See State v. Douglas C.*, 285 A.3d 1067, 1082–83 (Conn. 2022); *accord United States v. Newell*, 658 F.3d 1, 21 (1st Cir. 2011).

"Because of the unique nature of these two unanimity issues, federal courts have applied different tests to these distinct circumstances to determine whether a defendant's right to jury unanimity has been violated." *Douglas C.*, 285 A.3d at 1078 (noting that this federal jurisprudence is "well-established"). Thus, cases that only consider "alternative statutory means for committing one offense" do not control cases involving "distinct instances of the same crime which could have resulted in potentially multiple convictions." *See Correa-Ventura*, 6 F.3d at 1080–81.

Determining that a charge is duplicitous is generally the beginning of the constitutional analysis, not the end. Contrary to the majority's categorical rule, other courts agree that a duplicitous charge is not presumptively invalid absent a specific-unanimity instruction—rather, due process concerns arise only when the charge at issue implicates the duplicity doctrine's policy justifications. *See, e.g.*, *Douglas C.*, 285 A.3d at 1078, *United States v. Olmeda*, 461 F.3d 271, 281 (2d Cir. 2006); *United States v. Jaynes*, 75 F.3d 1493, 1502 & n.7 (10th Cir. 1996); *United States v. Kamalu*, 298 F. App'x 251, 254–55 (4th Cir. 2008); *United States v. Davis*, 471 F.3d 783, 790–91 (7th Cir. 2006); *United States v. Prieto*, 812 F.3d 6, 11–12 (1st Cir. 2016); *United States v. Moyer*, 674 F.3d 192, 204–05 (3d Cir. 2012); *United States v. Alsobrook*, 620 F.2d 139, 142–43 (6th Cir. 1980). These courts all acknowledge that a specific-unanimity instruction *can* cure a duplicitous charge, and I agree with the court that providing a specific-unanimity instruction in close cases should be considered best practice. But here we are deciding whether such an instruction was *required*—and more specifically whether the district court's decision not to sua sponte include such an instruction was an abuse of discretion

that warrants *reversal* of an otherwise valid conviction.[5] And a duplicitous charge generally warrants reversal only if charging multiple completed offenses in a single count prejudices the defendant. *See, e.g.*, *United States v. Singer*, 782 F.3d 270, 276 (6th Cir. 2015); *Davis*, 471 F.3d at 790; *Olmeda*, 461 F.3d at 281; *State v. Roberts*, 14 P.3d 713, 737 (Wash. 2000) (en banc). Most relevant here, the duplicity analysis considers (1) whether charging a single count provided adequate notice to enable the defendant to understand the factual basis of the charges and defend against them; (2) whether there was a "*genuine* possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts"; and (3) whether requiring or incentivizing the State to charge each act individually would subject the defendant to multifold punishment or otherwise affect appropriate sentencing. *United States v. Mancuso*, 718 F.3d 780, 793 (9th Cir. 2013) (emphasis added) (citation omitted) (internal quotation marks omitted) (discussing risks of non-unanimity and jury confusion); *accord, e.g.*, *United States v. Margiotta*, 646 F.2d 729, 732–33 (2d Cir. 1981) (also discussing notice and sentencing considerations). Without a case-by-case assessment closely attuned to these due process considerations, our unanimity test risks

---

[5]     Much of the duplicity jurisprudence developed from review of indictments rather than jury instructions. But *Schad* itself suggested that the same principles apply in both contexts. *See* 501 U.S. at 631 (noting that the United States Supreme Court "never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, *any more than the indictments were required to specify one alone*." (emphasis added)). *See also Correa-Ventura*, 6 F.3d at 1082 (noting that duplicity cases are "somewhat instructive for determining whether factual concurrence is required in a given case" despite the fact these issues generally relate to different stages of criminal proceedings).

becoming "an exercise in mere formalism." *Margiotta*, 646 F.2d at 732–33 (citation omitted) (internal quotation marks omitted).[6]

Properly understood here, even the reasoning of *Schad*'s dissent would not always require a specific-unanimity instruction to cure a duplicitous charge because it is concerned with preventing verdicts based on materially different factual conclusions, not with alternative legal characterizations of the same conduct. The *Schad* dissent disagreed with the plurality's conclusion that the jury instructions did not create a unanimity issue, but for entirely different reasons than the majority relies on here. To the dissent in *Schad*, the instructions allowed the jury to find the defendant guilty of first-degree murder even if the jurors disagreed as to whether the defendant was guilty under a premeditated murder theory or a felony murder theory. *Schad*, 501 U.S. at 653 (White, J., dissenting). But critically, the potential for disagreement mattered because premeditated murder and felony murder had *different elements*. *Id.* (White, J., dissenting). That difference could allow the jury to still reach a guilty verdict even if two subsets of jurors reached very different sets of factual determinations:

---

[6]    The court's primary concern with this approach seems to be the difficulty of applying it consistently. I am sympathetic to that concern, and I acknowledge—as did the court in *United States v. Correa-Ventura*—that "the approach [I] advance today does not yield any brightline tests" for determining when a specific-unanimity instruction is required. 6 F.3d at 1082. But "the dictates of due process do not often lend themselves to easy application." *Id.* Moreover, once the court requires district courts to engage in potentially difficult questions of statutory interpretation to determine whether a duplicitous charge creates a *theoretical* risk of non-unanimity as to an element of the offense, it seems only a modest additional step to require district courts to also consider whether that risk——or any other form of prejudice—actually *materialized* in the case before them.

> [T]he plurality affirms this conviction without knowing that even a single element of either of the ways for proving first-degree murder, except the fact of a killing, has been found by a majority of the jury …. [I]t violates due process for a State to invoke more than one statutory alternative, *each with different specified elements*, without requiring that the jury indicate on which of the alternatives it has based the defendant's guilt.

*Id.* at 655–56 (White, J., dissenting) (emphasis added).

Our case law, at least until now, seemed to implicitly reflect this understanding of *Schad* and *Richardson*. In *State v. Pendleton*, we noted that "the jury does not have to unanimously agree on the facts underlying an element of a crime in all cases" and explained that this principle applies to both the mens rea and actus reus elements of an offense. 725 N.W.2d at 731. We concluded that a specific-unanimity instruction was not required because "[t]he three kidnapping purposes available to the jury to prove that [the victim] was murdered while being kidnapped are *not so inherently distinct as to violate due process*." *Id.* at 732 (emphasis added). *State v. Ihle* considered whether a specific-unanimity instruction was required on an obstruction of legal process charge under a statute that listed three possible violations. 640 N.W.2d 910, 918–19 (Minn. 2002). There, too, our core justification for upholding the defendant's conviction—even without a specific-unanimity instruction *and* the State presenting evidence of different acts that violated the statute—was that the charge presented "no risk of unfairness," and thus "no due process violation as to jury unanimity." *Id.* at 919 (observing that these acts "are not inherently different types of conduct grouped under a single offense, and in this case they were committed as part of a single behavioral incident"). So too in *State v. Crowsbreast*, where we observed that:

> The grouping of past acts of domestic abuse as a preliminary factual element of domestic abuse homicide, which underlies the verdict, is in no way an *irrational* or *unfair definition* of domestic abuse homicide, nor are those acts *so inherently separate* as to present a due process issue as to jury unanimity.

629 N.W.2d 433, 439 (Minn. 2001) (emphasis added).

The court of appeals, too, had coalesced around an approach that does not require a specific-unanimity instruction in cases involving a course of conduct. Although the majority's more rigid interpretation of the elements-versus-means test derives from the court of appeals' decision in *State v. Stempf*, 627 N.W.2d 352 (Minn. App. 2001), the majority ignores conflicting, more recent decisions in cases that bear much stronger factual similarities to this one. In *State v. Rucker*, for example, the court of appeals concluded that *Stempf* did not require a specific-unanimity instruction on a single criminal sexual conduct charge that alleged ongoing sexual abuse over two years. 752 N.W.2d 538, 548 (Minn. App. 2008). The court reasoned that a specific-unanimity instruction was not required because, as here:

> [T]he prosecution … did not emphasize certain incidents, distinguish as to the proof of some incidents compared to others, or encourage the jury to find certain incidents were more likely to have occurred than other incidents, and appellant did not present separate defenses for each incident of alleged sexual abuse[.]

*Id.* And later court of appeals decisions adopted this reasoning when the alleged acts were far more separated in time and location than here. *See, e.g.*, *State v. Ellis*, No. A16-1216, 2017 WL 3222008, at *3 (Minn. App. July 31, 2017) ("[I]t is not clear under *Rucker* that the unanimity instruction was required because the [S]tate presented evidence of multiple distinct acts *that allegedly took place on different dates* …." (emphasis added) (footnote

omitted)); *State v. Yang*, No. A24-0228, 2025 WL 440433, at *4 (Minn. App. Feb. 10, 2025) ("[T]he law on when a unanimity instruction is required is unsettled. Under *Rucker*, a unanimity instruction is not required when the state charges the defendant with a single incident of criminal sexual conduct but then presents evidence of multiple distinct acts that allegedly occurred on different dates. Instead, whether a unanimity instruction is required depends on the particular facts of each case, such as whether the defendant's conduct occurred in substantially the same time and place, whether there was more than one victim, whether the state emphasized and weighed the separate incidents, [and] whether the defendant raised separate defenses to each incident …." (footnote omitted) (citations omitted)).

Thus, neither our cases nor those of the United States Supreme Court require that a jury must unanimously agree in every single case on which specific act the defendant committed if the State alleges discrete acts.

### C.

This case illustrates why a duplicitous charge should be treated differently than the unanimity-as-to-elements problem *Schad* and *Richardson* considered. Here, the jury unanimously agreed that the sexual penetration element was met. It unanimously agreed on the statutorily enumerated *means* by which that element was met: forced fellatio. And it even unanimously agreed that the forced penetration occurred within a narrow 45-minute timeframe in S.B.'s home. These circumstances differ significantly from the hypothetical charge Justice Scalia suggested would violate due process in *Schad*: "an indictment charging that the defendant assaulted either X on Tuesday or Y on

Wednesday." *See Schad*, 501 U.S. at 651 (Scalia, J., concurring). Nor is our criminal

sexual conduct statute like Justice Scalia's hypothetical "umbrella" crime or *Richardson*'s

continuing-criminal-enterprise statute where a single criminal statute prohibits

conceptually distinct offenses. Rather, this case is much closer to Justice Scalia's first

hypothetical:

> When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her.

*Id.* at 650 (Scalia, J., concurring).[7]

Here, even if six jurors thought Keyes forced S.B. to perform fellatio in the

bedroom, but not the living room, and the other six thought Keyes forced S.B. to perform

fellatio in the living room, but not the bedroom, all twelve jurors still unanimously agreed

---

[7]    Judge DuPlantier's concurrence in *Correa-Ventura* poses an even more apt hypothetical:

> Assume that a rifle and a pistol are found in the room in which the defendant is apprehended during a drug transaction. A single count in an indictment charges that both firearms were 'used and carried' 'during and in relation to' the drug activity, and the prosecutor argues to the jury that both firearms were so used. Defendant contends that both were collector's items. Six jurors conclude that the government proved beyond a reasonable doubt that the rifle was 'used,' but not the pistol. The other six conclude that there is reasonable doubt about the rifle, but that there is no doubt that the pistol was 'used' in the drug crime. The defendant would properly be found guilty of violating the statute, for each juror would have concluded that defendant used or carried 'a firearm' during and in relation to the drug trafficking crime charged in the indictment.

6 F.3d at 1087 (DuPlantier, J., concurring).

that Keyes forced his penis into S.B.'s mouth somewhere in the house during the incident. Thus, to use *Richardson*'s language, all twelve jurors unanimously agreed the State had proven the sexual penetration element of first-degree criminal sexual conduct beyond a reasonable doubt. 526 U.S. at 817. That's true despite the *purely theoretical* possibility that one or more jurors could not identify the precise time during the assault and location in the house where that occurred. These details are, at best, "brute facts" that "underl[ie]" the element of sexual penetration, which the jury "need not always decide unanimously." *Id.* The State's decision to charge a single count while presenting evidence that Keyes forced S.B. to perform fellatio twice over the course of a nearly continuous 45-minute assault simply does not present the same risk of "cover[ing] up wide disagreement among the jurors about just what the defendant did" as the continuing-criminal-enterprise charge at issue in *Richardson*. *Cf.* 526 U.S. at 819.

Having shown why the elements-versus-means distinction is a poor fit for the type of factual concurrence at issue here, I now apply what I believe to be the proper test for specific unanimity. Again, a duplicitous charge is not necessarily a due process violation. In deciding whether a specific-unanimity instruction is required, courts should assess whether alleging multiple acts in a single charge resulted in inadequate notice to the defendant of the State's theory of liability or created a genuine risk that a general verdict of guilty would conceal non-unanimous factual findings about which act satisfies an element of the offense in light of the statutory language, "the specific facts presented," and the State's characterization of the acts at trial. *See, e.g.*, *Correa-Ventura*, 6 F.3d at 1082. Because our unanimity jurisprudence may affect the State's charging decisions, it is

also appropriate to consider the effect that charging multiple acts under one count versus bringing multiple separate counts might have on appropriate punishment. *See, e.g.*, *Margiotta*, 646 F.2d at 732–33. I address these considerations in turn.

Here, the State's charging decisions provided Keyes with adequate notice. Keyes's first trial ended in a mistrial after the court determined that a video exhibit was not properly redacted. S.B. testified at the first trial that Keyes forcibly sexually penetrated her in her bedroom and again in the living room. Thus, the defense *knew* the State would present evidence of multiple acts but did not move for the State to amend its charging documents before the second trial, from which this appeal follows. Instead, Keyes argued that the 'new' allegation at trial supported his primary defense—inconsistencies between S.B.'s testimony and various accounts given to law enforcement created reasonable doubt as to whether S.B.'s account of the sexual assault was truthful. The defense opted not to renew its request for a specific-unanimity instruction after the State's closing argument, and instead argued the following to the jury:

> And then for the first time in her testimony, she says that more than one instance of oral penetration happened. That's not a minor detail. That's not a -- not being asked a question. That is a huge change in information…. So the State wants you to accept as credible, her testimony that she gave here today, even though it is -- it's most important parts entirely inconsistent with what she told the cops, entirely new information from what she told the cops. And would you accept, in your everyday lives when making an important decision, somebody who told you information like that, who you talked to multiple times, didn't tell you something, didn't tell you something and then almost a year later said something completely different, that's not credible, that's not believable.

After the jury rejected this argument, counsel's strategic decision to pursue it, rather than renew her request for a specific-unanimity instruction, provides no basis for reversal.

Moreover, the second allegation of penetration did not affect Keyes's other defenses. Keyes's arguments over S.B.'s motives to fabricate her accounts of sexual abuse and the possibility of cross-contamination when testing the DNA evidence apply equally to both acts.

Now compare this situation with *Wenthe*. In *Wenthe*, the State had initially charged the defendant under an earlier version of the criminal sexual conduct statute that had sexual contact on an "ongoing basis" as an element. 865 N.W.2d at 297, 300. It planned to present evidence of "at least two" instances of sexual contact at trial. *See id.* at 297. Yet, *the very same day* as trial, the State added an additional count of criminal sexual conduct that could have been proven by *any* of these instances but did not specify which instance provided probable cause in the complaint. *Id.* at 299. Furthermore, the prosecution explicitly told the jury during closing argument that they could rely on *any* of these instances to find the defendant guilty:

> The state … has talked about many meetings where [the elements of the single-meeting offense were satisfied] …. The time period for this charge is November 1st of 2003 to December 31st of 2003. So if there were any meetings where sexual contact occurred [during that time period], the defendant is guilty.

*Id*. at 298–299. This framing would have made it significantly more difficult for Wenthe to present defenses specific to any particular incident. But despite finding the State's charging decisions and trial strategy "very troubling," *id.* at 299, we still concluded that the omission of a unanimity instruction did not affect the defendant's substantial rights. *Id.* at 301.

For similar reasons, there was no *genuine* risk of jury confusion or a non-unanimous factual finding on an element of the criminal sexual conduct charge. Unlike the multiple acts alleged over a two-month period in *Wenthe*, both acts here occurred in narrow 45-minute timeframe in S.B.'s home. Her testimony described the circumstances of both instances of forced fellatio clearly and in equal amounts of sensory detail. Her testimony regarding both the initial and continued forced acts of sexual penetration was corroborated both by statements she made to responding officers at the hospital (which the jury saw) and by DNA evidence identifying Keyes's sperm cell DNA on a swab taken from S.B.'s mouth and S.B.'s DNA on swabs taken from Keyes's pubic area. No forensic evidence tended to show that penetration occurred in one area of the house but not the other. During a colloquy regarding defense counsel's initial request for a specific-unanimity instruction, the prosecution agreed not to suggest that the jury could return a guilty verdict even if they believed that only one act of penetration occurred. Indeed, the prosecutor's closing argument referred only to "forced oral sex" in general without mentioning the two individual acts. Thus, unlike *Wenthe*, the State's charging decision and presentation of evidence never "invited ambiguity" as to the factual proof of the sexual penetration element in any meaningful way. *Cf id.* at 299. And, even more to the point, Keyes never explains why the jury would have found S.B.'s testimony and the State's arguments credible as to one act but not the other. To the extent the jury even considered Keyes's conduct to be divisible into separate acts in the first place, the more likely conclusion from this record is that the jury unanimously agreed that *both* acts occurred. Under these circumstances, it makes no sense to suggest that Keyes's

conviction on one count should be reversed because the State could have convicted him of two.

This analysis aligns with cases from other jurisdictions holding that a charge is not *prejudicially* duplicitous if the multiple alleged acts "represent a single, continuing scheme that occurred within a short period of time and that involved the same defendant." *Alsobrook*, 620 F.2d at 142; *see also, e.g.*, *Davis*, 471 F.3d at 790; *Kamalu*, 298 F. App'x at 254; *United States v. Shorter*, 809 F.2d 54, 56 (D.C. Cir. 1987), *abrogated on other grounds by Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Cohen v. United States*, 378 F.2d 751, 754 (9th Cir. 1967); *People v. Jones*, 792 P.2d 643, 658–59 (Cal. 1990); *United States v. Tawik*, 391 F. App'x 94, 97 (2d Cir. 2010). On that point, the District of Columbia Court of Appeals' decision in *Gray v. United States*, 544 A.2d 1255 (D.C. 1988), is almost spot-on. That case also considered whether a specific-unanimity instruction was required when the government brought a rape charge against the defendant, the act element of which could have been met by multiple, discrete alleged acts of penetration. *Id.* at 1255–56. The government's evidence showed that the rape, which occurred in a public park, was briefly interrupted when the defendant moved the victim deeper into the park to avoid being seen and the defendant again paused when two bystanders approached the scene. *Id.* at 1256. But, as the court explained:

> [T]he 'incidents' here were neither factually nor legally separable. This rape, like many assaults, was committed in a continuous course of conduct. There was no significant break between the events. Although appellant and the complainant moved a short distance between the first two acts of sexual intercourse, and all three acts necessarily were separated by a few minutes,

these short spatial and temporal separations were not enough to transform a single course of action into several separate rapes. Similarly, the interruptions between the second and third acts of intercourse did not terminate appellant's original intent to have and complete sexual intercourse against the will of the complainant.

*Id.* at 1258–59. It then noted that the allegedly separate acts were not "legally separable" because, as here, "[a]ppellant presented the same defenses to the entire series of acts" and "the jury was not called upon to consider or analyze each act separately …. nor was there any other factor that would have tended to cause jury confusion." *Id.* at 1259. Ultimately, the court held that "when a single count is charged and the facts show a continuing course of conduct, rather than a succession of clearly detached incidents, a [specific] unanimity instruction is unnecessary, absent some factor that differentiates the facts on legal grounds." *Id.* at 1258.

Here, too, Keyes briefly pausing the assault before resuming the penetration in the living room does not separate what is otherwise a continuous assault into two factually and legally distinct culpable acts. Put simply: there is nothing "fundamental[ly] [un]fair[]" about this charge that offends the basic due process principles behind the specific unanimity requirement explained in *Schad*, *Richardson*, our case law, and that of other jurisdictions. *See Schad*, 501 U.S. at 637. The jury here could not have reached a guilty verdict unless all twelve jurors concluded that Keyes had committed at least one act of sexual penetration during the assault beyond a reasonable doubt, and I would not hold that the district court abused its discretion by not sua sponte providing a specific-unanimity instruction under these circumstances.

D.

Even under the majority's statute-based analytical framework, it is not clear that a unanimity instruction was required here. *Stempf*, from which the majority borrows its approach, left open the possibility that a specific-unanimity instruction might not be required even when the state alleges discrete acts so long as those acts make up a continuous course of conduct. 627 N.W.2d 352, 358–59 (Minn. App. 2001) ("We need not decide … that a different result would be warranted when the separate acts constitute a continuing course of conduct. The two acts alleged in this case *lack unity of time and place*; they are separate and distinct culpable acts, either one of which could support a conviction." (emphasis added) (footnote omitted) (citation omitted)). Although I agree that the relevant statute defines the elements of an offense and with the majority's interpretation of those elements, I disagree that this interpretation requires a unanimity instruction. That is because "sexual penetration" is arguably (or should be) chargeable as a course of conduct.[8]

---

[8] The following analysis assumes that the court would not require a specific-unanimity instruction when the statutory language allows multiple acts to be brought under a single charge (*i.e.*, it would interpret the course of conduct, rather than the individual acts that comprise it, as the relevant element of the offense). I am not convinced this approach is correct, however. Allowing statutory language alone to dictate the constitutionality of a course of conduct charge "not only would *prohibit* course of conduct charging in cases in which it may be warranted, but also may *permit* it in cases in which it could be unconstitutional." *Douglas C.*, 285 A.3d at 1104 (Mullins, J., concurring) (emphasis added). Indeed, "fundamental fairness and due process of law may *prohibit* combining what could be several independent charges into a single count, *even if* the text of a particular statute allows it." *United States v. Root*, 585 F.3d 145, 154 (3d Cir. 2009). In my view, that makes an inquiry into these due process considerations on the unique facts of each case essential to the analysis. But unless and until my preferred

Minnesota Statutes § 609.341, subd. 12, defines "sexual penetration" as "(1) sexual intercourse, cunnilingus, fellatio, or anal intercourse; *or* (2) any intrusion however slight into the genital or anal openings." (Emphasis added). The statute does not expressly state that the terms "sexual intercourse, cunnilingus, fellatio, or anal intercourse" can refer to a course of conduct, but there are at least two reasons to think they might.

First, "every law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16; *see also Allan v. R.D. Offutt Co.*, 869 N.W.2d 31, 33 (Minn. 2015) ("[N]o word, phrase, or sentence [in a statute] should be deemed superfluous, void, or insignificant." (citation omitted) (internal quotation marks omitted)). If Minn. Stat. § 609.341, subd. 12(1)'s applicability to "sexual intercourse, cunnilingus, fellatio, or anal intercourse" did not refer to a continuing course of conduct, then subdivision 12(2)'s reference to "any intrusion however slight into the genital or anal openings" would render the terms "sexual intercourse" and "anal intercourse" superfluous because these acts involve "intrusion … into the genital or anal openings." Section 609.341, subd. 12(1), must therefore contemplate acts that take place over an appreciable length of time. The contrary interpretation would not "give effect" to the statutory language of subdivision 12(1). As a result, I believe the statute is at least ambiguous as to whether the acts enumerated in § 609.341, subd. 12(1), support course-of-conduct charging.

---

approach is adopted, I encourage the Legislature to amend our first-degree criminal sexual conduct statute to explicitly allow course-of-conduct charging in like cases.

Having determined that the statute is ambiguous in this respect, I now look to other canons of construction to help resolve the question of whether § 609.341, subd. 12(1), supports course-of-conduct charging. *See* Minn. Stat. § 645.16 ("When the words of a law are not explicit, the intention of the [L]egislature may be ascertained by considering, among other matters, [enumerated canons of construction]."). If a statutory term is ambiguous, we can consider "the consequences of a particular interpretation" to illuminate the intended meaning of the statute. Minn. Stat. § 645.16(6).

Notably, we presume that the Legislature did not intend a meaning that leads to "absurd" results. Minn. Stat. § 645.17(1). Under Keyes's interpretation, however, the State can—or perhaps *must*—charge every single instance of penetration, "however slight," Minn. Stat. § 609.341, subd. 12(2), during a sexual assault as a separate count of criminal sexual conduct. We do not think the Legislature would have intended to permit (or require) the State to charge a defendant accused of, say, ongoing fellatio or vaginal or anal rape with dozens or more counts under Minn. Stat. § 609.341, subd. 12(2). That interpretation of the statute would potentially subject the defendant to "multifold punishment" in the form of an unjustifiably high number of convictions, and "multiple, separate charges repeatedly alleging the same violation [may suggest] that the defendant must be guilty if there are so many charges." *Douglas C.*, 285 A.3d at 1103 (Mullins, J., concurring). And consider a different, common context: As Keyes acknowledged at oral argument, a similar interpretation of our assault statutes in conjunction with the court's new rule could allow the State to charge a hypothetical defendant who engaged in a

fistfight with separate counts of simple assault for each blow or require the jury to be unanimous about which specific blow(s) inflicted bodily harm.

In sexual assault cases, "determining how many crimes were committed is much less clear" than in other cases (such as murder, for example). *See Newell*, 658 F.3d at 23–24. So, to the extent that Keyes's approach dictates the State's charging decisions, it would gut the discretion we have typically afforded to prosecutors and make prosecution of some cases effectively impracticable. And in this context, it could have the perverse result of making longer and more serious assaults involving different types or more instances *more* difficult to prove if the victim cannot recall the details of each violation with particularity. As discussed below, trauma makes that particularly likely for victims of sexual assault. An interpretation that gives the State discretion to charge Minn. Stat. § 609.341, subd. 12(1), as a single course of conduct in cases, like this one, that involve multiple instances of penetration over the course of a single, continuous assault, would avoid these results.

In contrast, the majority's interpretation seems to read additional language into the statute that is not there. Practically speaking, the majority's interpretation is that "sexual penetration" means not only the conduct proscribed by Minn. Stat. § 609.341, subd. 12, but *only one* instance of that conduct and *only if* the victim can identify precisely how, when, and where that occurred. Again, those circumstances are not elements of the offense, but simply "underlying brute facts," *Richardson*, 526 U.S. at 817, or "preliminary factual issues which underlie the verdict." *Schad*, 501 U.S. at 632. Thus, potential disagreement among jurors about where and when the defendant's conduct

D-31

occurred does not necessarily indicate disagreement as to an *element*. For crimes like criminal sexual conduct, the court's approach raises the prosecution's burden to prove each element of the offense beyond what *Richardson* (and the Constitution) requires. And it requires victims to academically dissect their memory of a highly traumatizing incident, decide when it began and ended, and recall and recount each individual act of penetration in detail. That is unrealistic at best, and cruel at worst.

E.

For similar reasons, the criminal sexual conduct charge here presents a particularly poor vehicle to jettison the single behavioral incident test relied on by our court of appeals and announce the new framework the majority adopts. As discussed above, that framework is not compelled by binding authority, and I am deeply concerned with the potential impact the majority's categorical approach will have on the State's ability to effectively prosecute criminal sexual conduct cases and obtain justice, already elusive, for victims of these crimes. The functional, case-by-case analysis followed by other jurisdictions is more faithful to the fundamental fairness rationale behind *Schad* and *Richardson*, while also accounting for the specific evidentiary challenges in proving these acts and accommodating trauma-informed approaches to victim testimony.

Criminal sexual conduct cases present unique difficulties. Nearly four in five rapes and serious sexual assaults go unreported. *See* Bur. Just. Stat., *Criminal Victimization: 2016, Revised* 7 (2018). Of those that are, only about 40 percent involve viable DNA evidence. *See* Heather Waltke et al., Nat'l Inst. of Just., *Sexual Assault Cases: Exploring the Importance of Non-DNA Forensic Evidence*, NIJ J. 279 (2018), at 2–3. Yet studies

show that over 70 percent of jurors expect to see DNA evidence in criminal sexual assault trials, and juries are *33 times* more likely to return a guilty verdict when the prosecution presents DNA evidence. *Id.* at 2. Although DNA and various non-DNA forensic evidence can establish the perpetrator's identity and an act of penetration, this evidence is not probative in cases where the key issue is *consent*—and nearly 80 percent involve an intimate partner, friend, or acquaintance of the victim. *See id.* Put together, this means that, in most criminal sexual conduct cases, the State's case depends on the substance and credibility of the survivor's testimony.

But our rules of evidence already stack the deck against survivors of sexual assault. The scientific literature includes many studies demonstrating the effect of trauma on survivors' memory of traumatic events. First, trauma affects the brain's ability to encode so-called autobiographical memory—stress hormones can temporarily improve encoding, but sustained elevation of these hormones during a prolonged assault is highly disruptive, leading to fragmented memories. J. Douglas Bremner, *Does Stress Damage the Brain?* 45 Bio. Psych. 797, 798 (1999). High emotional response during a traumatic event also causes the hippocampus to dissociate from the amygdala, which can result in non-linear memories that jumble time, sensation, and awareness of one's physical environment. *See* Lori Haskell & Melanie Randall, Dep't Just. Can., *The Impact of Trauma on Sexual Assault Victims*, Cat. No. J4-92/2019E-PDF 21 (2019); Martin A. Conway, *Ten Things the Law Should Know About Trauma and Memory* (noting that traumatic memories are "fragmentary, disordered, disjointed, and often contain details that do not derive from experience"), *in* Memory and Law (Lynn Nadel & Walter P.

D-33

Sinnott-Armstrong eds., Oxford Univ. Press 2012), at 363. Experiencing trauma temporarily reduces activity in the part of the brain associated with speech; the brain is more likely to encode traumatic memories without word associations, making them "difficult to access verbally." *See* M. Rose Barlow et al., *Trauma and Memory*, *in* Gold, APA Handbook of Trauma Psychology: Vol. 1, Foundations in Knowledge (2017), at 315. Moreover, trauma victims tend to disassociate during traumatic events, further increasing the likelihood of gaps in their memory. Brit. Psych. Soc'y Rsch. Bd., Guidelines on Memory and the Law: Recommendations from the Scientific Study of Human Memory 27 (2018). All together, "[t]he cumulative impact of these encoding issues is that memories of trauma are often incomplete, consisting primarily of vivid sensory memories without context, time sequence information, or the linguistic narrative structure that gives a person's ordinary memories a sense of logical and chronological coherence." Thor Paulson et al., *Towards a Trauma-Informed Approach to Evidence Law*, 101 Can. Bar. Rev. 498, 516 (2023) (citation omitted) (internal quotation marks omitted).

Beyond memory formation issues, trauma separately affects survivors' ability to later retrieve and recount traumatic memories orally. Prolonged exposure to stress hormones in trauma survivors shrinks the hippocampus over time, making traumatic memories increasingly "vulnerable to disruption and difficult to access." Barlow, *supra*, at 315-16. Survivors can also voluntarily or involuntarily suppress traumatic memories, which affects recall and "lineal, verbal reprocessing" of memories. *Id.* at 318-19. And traumatic memories, more than others, are likely to change over time or with repeated re-telling. Brit. Psych. Soc'y, *supra*, at 27. Nearly half of sexual assault survivors suffer

from (diagnosed) post-traumatic stress disorder, but trauma survivors can experience some or all of these memory issues even without PTSD or a similar condition. Paulson, *supra*, at 505, 517 (footnote omitted) (citation omitted).

These impacts already make survivors of sexual assault *inherently* less able to serve as reliable, credible witnesses under existing rules of evidence, through no fault of their own. Factfinders may well assume that survivors' testimony is not reliable simply because the victim-witness cannot recall with specificity the details of the assault or recount those details in a logical, cohesive verbal narrative. Moreover, our system assumes that prior inconsistent statements adversely reflect on a witness's credibility— prior inconsistencies are widely considered to be the gold-standard of impeachment evidence because these inconsistencies can indicate that the witness's trial testimony is dishonest. *See* Paulson, *supra*, at 510–11 ("Impeaching witnesses on prior inconsistent statements has been described as a highly effective strategy to attack credibility that is probably the most valuable means of assessing the credibility of a crucial witness and can have a powerful impact on credibility both as it relates to the specific inconsistency and the overall veracity and reliability of a witness." (footnotes omitted) (citations omitted) (internal quotation marks omitted)).

But trauma's effects on memory and cognition unsettle these assumptions. As our cases in other contexts have recognized, there are any number of reasons why a traumatized victim-witness's trial testimony might deviate from statements made during police investigations and pre-trial proceedings, *even though the victim-witness is honestly recounting their subjective perception of events at all stages of the case. See, e.g., State v.*

*Portillo*, 998 N.W.2d 242, 252 n.8 (Minn. 2023) ("Recent scholarship has pointed out that [p]sychological trauma can operate … in undermining the internal consistency of a survivor's story, and it is indeed a predictable result that a survivor will skip, or forget, certain parts of her story." (alteration in original) (citation omitted) (internal quotation marks omitted)). Responding to slightly different, but related concerns, the Legislature has recognized the difficulty of proving sexual assault through victim testimony. Indeed, it specifically passed a statute clarifying that "[i]n a prosecution [for criminal sexual conduct], the testimony of a victim need not be corroborated." Minn. Stat. § 609.347, subd. 1.

The majority's approach does not account for these realities. And it compounds the evidentiary difficulties they create. Keyes maintains that, if a sexual assault involves multiple instances of sexual penetration, the State must either charge each discrete act as a separate count or give a specific-unanimity instruction requiring all jurors to agree on which acts occurred. But there are any number of scientifically established reasons why a victim-witness may not remember the specific details of each act of penetration or be able to orally narrate those details logically and coherently enough to be perceived as credible and reliable by a jury. Keyes's position therefore puts form ahead of substance: even if the jury unanimously agrees that a sexual assault occurred, the prosecution would be substantially less likely to succeed on any individual count (or a single count with a specific-unanimity instruction) even for a continuous assault simply because there might be possible disagreement as to the specific details of each act. Perversely, that is even more likely for serious assaults that continue over a longer time and involve more (or

different) acts of penetration. *Cf. Richardson*, 526 U.S. at 831 (Kennedy, J., dissenting) ("[T]he individual violations making up a continuing series may not always be easy to prove with particularity."). Indeed, the court essentially "penaliz[es]" S.B. "for providing whatever limited, specific details [she] might be able to recall." *Douglas C.*, 285 A.3d at 1124 (Mullins, J., concurring). The consequence of this decision in at least some future sexual assault cases is clear: the mountain that sexual assault survivors must scale to obtain justice is now taller and steeper.

My preferred approach also would preserve the discretion we have afforded prosecutors—apparently until now—not to charge multiple, substantially identical offenses occurring together as separate crimes. *Cf. Richardson*, 526 U.S. at 826 (Kennedy, J., dissenting) ("The consequences of the Court's decision go well beyond the jury instruction the Court discusses. The Court's decision of necessity alters the manner in which the Government must frame its indictment and design its trial strategy."). That discretion sometimes benefits defendants, too. As noted in Parts C and D of this opinion, Keyes's approach would allow—or potentially *require*—the State to charge each *instance* of penetration during an ongoing assault as a separate crime, "thereby exposing the defendant to multifold punishment." *Douglas C.*, 285 A.3d at 1103 (Mullins, J., concurring). With a more flexible approach that preserves prosecutorial discretion, defendants' "potential sentencing exposure is not as great, and the jury sees only one charged crime, rather than multiple, separate charges repeatedly alleging the same violation and thus suggesting that the defendant must be guilty if there are so many charges." *Id.* (Mullins, J., concurring).

*     *     *

There are no doubt instances in which a specific-unanimity instruction is needed to protect criminal defendants from charges that might unconstitutionally reduce the prosecution's burden to prove each element of the alleged offense. But this case is not one of them. Especially in the context of sexual assault, it is equally important to acknowledge the experience and interest in justice for victims on the other side of the ledger. With a more holistic approach, "victims of these heinous crimes can have their day in court and not be shut out because they cannot recall, with specificity, particular incidents." *Id.* at 1125 (Mullins, J., concurring). Accordingly, I respectfully dissent.


McKEIG, Justice (dissenting).

    I join in the dissent of Justice Moore, III.

HENNESY, Justice (dissenting).

    I join in the dissent of Justice Moore, III.